# MITCHELL COAL AND COKE COMPANY *v.* PENNSYLVANIA RAILROAD COMPANY.

### ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 674. Submitted December 4, 1912.—Decided June 9, 1913.

*Pennsylvania Railroad Co.* v. *International Coal Co., ante,* p. 184, followed to effect that the courts have jurisdiction of a case brought by a shipper against a carrier for the amount of damages actually sustained by him for charging him the full tariff when it was carrying the same goods the same distance for other shippers at lower rates but that such damages must be sustained by proof as to the amount thereof.

The courts have not jurisdiction of a suit brought by a shipper against a carrier for damages by reason of paying other shippers of similar

goods an unreasonable amount for services in connection with such transportation, unless and until there has been a finding by the Interstate Commerce Commission that the payments so made to the other shippers were unreasonably large.

A carrier has the right under the Act to Regulate Commerce to pay shippers a reasonable allowance for services in connection with transportation of goods shipped by them, and the allowance paid must be treated by the courts as *prima facie* reasonable until the Interstate Commerce Commission has determined otherwise.

When the case is here on a question of jurisdiction only, this court cannot pass upon questions which go to the merits.

There is a necessity, which is recognized by the Act to Regulate Commerce, of having questions as to reasonableness of rates and allowances settled by a single tribunal in order to avoid the conflicting decisions which would result if several different tribunals could pass upon the same question; and the act itself has designated the Interstate Commerce Commission as that tribunal.

Allowances for lateral hauling may be lawfully paid, as they become unlawful only when unreasonable; whether unreasonable either past or future is a rate-making question over which the courts have no jurisdiction, even if the parties attempt to give it by consent.

This action, having been commenced without any application having been made to the Interstate Commerce Commission to declare unreasonable the allowances paid by the carrier for lateral hauling, the case must be remanded for dismissal, but the dismissal is stayed to give plaintiff an opportunity to make such application with the right to the carrier to be heard on the defense of limitations as well as other defenses.

192 Fed. Rep. 475, affirmed in part and reversed in part.

THE facts are stated in the opinion.

*Mr. George S. Graham* for plaintiff in error.

*Mr. John G. Johnson* and *Mr. Francis I. Gowen* for defendant in error.

MR. JUSTICE LAMAR delivered the opinion of the court.

On November 20, 1905, the Mitchell Coal and Coke Company brought suit in the Circuit Court of the United States for the Eastern District of Pennsylvania against

the Pennsylvania Railroad for damages alleged to have been occasioned by the payment of rebates to the Altoona, Glen White, Millwood, Latrobe and Bolivar Companies. The complaint alleged that between April 1, 1897, and May 1, 1901, the plaintiff, in competition with these companies, made shipments of coal and coke over the Pennsylvania road from the Clearfield District to the same general markets in other States and that, during all that time, the carrier paid rebates to these companies, pretending that the money given them was an allowance for transportation services rendered by them, in hauling cars over spur tracks between their mines and the railroad station.

The parties stipulated that the case should be submitted to a Referee, who should have the powers of a special master. His findings were in favor of the plaintiff. His report, modified as to the measure of damages, was confirmed (181 Fed. Rep. 403), but before judgment was entered thereon the carrier moved to dismiss the case because the court, as a Federal court, had no jurisdiction of the cause of action until after the Interstate Commerce Commission had passed upon the legality of the allowances and the reasonableness of the amount paid to shippers for hauling cars between their mines and the station. The motion was granted (183 Fed. Rep. 908), and the case was taken by writ of error to the Circuit Court of Appeals, which dismissed the case (192 Fed. Rep. 475) upon the ground that the question could only be reviewed by the Supreme Court of the United States. A writ of certiorari was denied (223 U. S. 733), and the plaintiff thereupon brought the case here by direct writ of error, the judge certifying the following as the jurisdictional question:

"Has the Circuit Court of the United States, in advance of any application to the Interstate Commerce Commission and action thereon by that body, jurisdiction to entertain an action of trespass brought by a shipper of coal

and coke to recover damages because of alleged unlawful preferential rates accorded to other and competing shippers of coal and coke, when such alleged preferential rates are claimed to have resulted from payments made to such other shippers, which payments the plaintiff claimed were rebates from the published and filed freight rate, and the defendant claimed were made as compensation for services rendered by such shippers or for other accounts which justified it in making the same, and when it further appeared that such payments had been made pursuant to a practice of long standing, and that a number of shippers other than the plaintiff were interested in the question of the lawfulness thereof."

1. The plaintiff's cause of action for damages occasioned by the payment of illegal or unreasonable allowances was one which, under §§ 8 and 9 of the Commerce Act (24 Stat. 382), could only be brought in a District or Circuit Court of the United States. The motion to dismiss challenged the jurisdiction of the court, as a Federal court, and its power "primarily to hear complaints concerning wrongs of the character of the one here complained of." *Texas &c. Ry. Co.* v. *Abilene Co.*, 204 U. S. 426, 442; *B. & O. R. R.* v. *Pitcairn Coal Co.*, 215 U. S. 481, 495; *Robinson* v. *B. & O.*, 222 U. S. 506. The order of dismissal was founded on the denial of jurisdiction, and this court has power to review that ruling. *Ira M. Hedges*, 218 U. S. 264, 270; *The Steamship Jefferson*, 215 U. S. 130. The case differs from *Darnell* v. *Illinois R. R.*, 225 U. S. 243. There the Commission had found that the rate was unreasonable. The demurrer, based on the failure to allege that a reparation order had been made in favor of the plaintiff, did not attack the jurisdiction of the court, as a Federal court, since the cause of action sought to be enforced was one which, if properly brought could, under the act of June 18, 1910 (36 Stat. 539, 554, c. 309), have been maintained either in a state or Federal court.

2. In the present case the motion to dismiss for want of jurisdiction was made at the end of the trial and was based, not upon the pleadings, but upon the evidence. It becomes necessary, therefore, to make a statement of the facts material to that issue:—The plaintiff, the Mitchell Coal and Coke Company, owned six coal mines in the Clearfield District, and between 1897 and May 1, 1901, shipped its products over the Pennsylvania Railroad in state and interstate commerce. During that time the provisions of the Commerce Act were constantly violated and there were many instances in which the carrier gave secret rates to shippers from whom it collected the full tariff and subsequently refunded the difference between the legal and the illegal rate. Many such rebates were paid to the plaintiff, the Mitchell Company, which in this case claimed the right to recover, as damages, the difference between these rebates paid to it and what it claimed were the additional rebates paid to the Altoona and other companies mentioned in the declaration. The Referee found that, for a part of the time, 70 per cent. of plaintiff's shipments had been made at secret rates, and held, citing *Pa. R. R.* v. *International Co.,* 173 Fed. Rep. 1, 9, that, as to this tonnage, the plaintiff was as much a violator of the statute as was the carrier and that no cause of action arising out of this illegal contract would be enforced by the courts. He therefore limited the inquiry to a consideration of the damages in respect to that part of the plaintiff's shipments on which no rebates had been paid.

From the Referee's report, and the testimony returned therewith, it appears that Clearfield District is the name given to a large coal field reached by the lines of the Pennsylvania Railroad. In this district there were many mines—some near the railroad and others at considerable distances therefrom, but all reached by lateral lines or spur tracks, over which cars were carried to and from the

mines. This Clearfield District was treated as a single shipping station, and the rates from all points therein were the same where coal was transported to the same point beyond the State. The published tariff named the rate from station to destination, but it was uniformly construed to include the haul from the mine. The published rate was so applied on all shipments made by the plaintiff as well as on those made by the Altoona and other companies named in the complaint.

It further appeared that to these companies the carrier paid what is called a trackage or lateral allowance, claiming that it was compensation allowed them for hauling cars from their mines to the station. The defendant's contention that there was no concealment of these payments is controverted by the plaintiff, which insists that it had no knowledge of such payments until 1898, when its officers were informed that the railway was paying some companies 10 cents a ton for such services. The Mitchell Company, the plaintiff, thereupon bought an engine to be used for that purpose at its Gallitzin mine and with this engine hauled cars, loaded and empty, between that mine and the station. For this work it demanded that the defendant should pay the same lateral allowance of 10 cents a ton that the railroad paid other companies for similar services. The carrier contended that it was itself prepared to do the switching at the Gallitzin mine, though, on account of dissimilarity of conditions, it could not economically do so at the Altoona and other mines referred to in the complaint. It therefore declined to pay a lateral allowance to the plaintiff, but offered to continue to treat this haul as included in the rate and to do that work without extra charge to the Mitchell Company. The plaintiff then offered to do the hauling for less than 10 cents, the exact amount not appearing. The proposition having been declined in 1899, the plaintiff, on November 20, 1905, brought this suit, offering evidence to show that in some

cases the allowance was as high as 18 cents a ton instead of 10 cents, as it had previously understood.

In addition to the Gallitzin mine, the plaintiff owned five others in the Clearfield District. They were located at points from 1,100 to 3,000 feet from the railroad and were reached by spur tracks belonging to the plaintiff, over which cars were hauled by the locomotives belonging to the Pennsylvania Railroad. For this service the carrier made no extra charge, treating it as included in the rate, though the tariff published the rate as from station to destination.

The mines of the Altoona, Glen White and Millwood Companies were located in the Clearfield District, while those of the Latrobe and Bolivar Companies were near by in the Latrobe District.

The Millwood was reached by a narrow gauge track, over which cars were hauled by that coal company's narrow gauge engines. For doing that work it was paid a lateral allowance of 15 cents a ton until April, 1899, and after that date 10 cents a ton.

The Glen White mine was about three miles from the main road and was reached by a spur having light rails, steep grades and sharp curves, over which the evidence tended to show that the engines of the railroad could not be safely or economically operated. This company transported the coal cars with its own engine and for doing that work the defendant paid it a lateral allowance of 15 cents a ton. On December 28, 1901 (subsequent to the transactions involved in this litigation), the carrier gave notice that it would discontinue lateral allowances on coke, but would allow 15 cents per ton on coal.

The Altoona mine was reached by a spur track, over which, with its own engines, the Altoona Company hauled cars and was paid a lateral allowance of 13 cents on coal and 10 cents on coke to points on the Hollidaysburg Branch, and 18 cents on coal and 20 cents on coke to

points east of Altoona. On December 28, 1901, this lateral allowance on coal was discontinued and that on coke reduced to 12 cents a ton. On January 1, 1902, all lateral allowances were discontinued.

Inasmuch as the payments to the Altoona were larger than those to any other coal company, the plaintiff claimed that they were the legal measure by which damages were to be assessed. The evidence was therefore specially directed to the situation at this mine, which was a little over three miles in an air line from the railroad and eight hundred feet above the station level. The grade was, not only very steep, but it was necessary to make use of three switchbacks in order to reach the elevation of the mine. The line was thus lengthened so as to be about 5 miles in length. The curves on this track were very sharp; the rails were light, and only specially constructed engines could be used. There was evidence that before the Pennsylvania's locomotives could have been operated over this spur it would have been necessary to put in heavy rails, strengthen the culverts and realign the track. Owing to the steep grade only four cars could be hauled at a time, and it required from three to six times as long to do the same amount of transportation work as at the Gallitzin mine.

3. The plaintiff insists that these facts demonstrate that the payments to the Altoona and other companies were not measured by the value of the track or locomotive, or by the cost of the service rendered, but were unreasonable in amount, were arbitrarily fixed, lowered or withdrawn and constituted a mere cover for rebating. On the other hand, the defendant insisted that, though bound to haul the cars to and from the mines, it could not economically do the work on account of the physical conditions at the Altoona, Millwood and Glen White mines and that it, therefore, employed those companies to perform that transportation service, paying them therefor an allowance

which is *prima facie* reasonable and must be so treated by the courts until the Commission has determined that it was excessive or constituted an unjust discrimination.

On this hearing, involving a matter of jurisdiction, we cannot pass upon these questions which go to the merits of the controversy    But these claims of the parties emphasize the fact that there are two classes of acts which may form the basis of a suit for damages.  In one the legal quality of the practice complained of may not be definitely fixed by the statute so that an allowance, otherwise permissible, is lawful or unlawful, according as it is reasonable or unreasonable.  But to determine that question involves a consideration and comparison of many and various facts and calls for the exercise of the discretion of the rate-regulating tribunal.  The courts have not been given jurisdiction to fix rates or practices in direct proceedings, nor can they do so collaterally during the progress of a lawsuit when the action is based on the claim that unreasonable allowances have been paid.  If the decision of such questions was committed to different courts with different juries the results would not only vary in degree, but might often be opposite in character—to the destruction of the uniformity in rate and practice which was the cardinal object of the statute.

4. The necessity under the statute of having such questions settled by a single tribunal in order to secure singleness of practice and uniformity of rate has been pointed out and settled in the *Abilene, Pitcairn* and *Robinson Cases* and is referred to here because this record and that in *Pennsylvania R. R. v. International Co., ante,* p. 184, just decided, furnish a striking illustration of the results which would follow if the reasonableness of an allowance could be decided by different tribunals.  Both cases involve the payment of 18 cents a ton to the Altoona Company during the same period and for identically the same reasons,  In both the plaintiff insisted that the payment

was a rebate, and the carrier that it was compensation
for services rendered. In the *International Case* the judge
treated the Altoona allowance as lawful and reasonable.
In this case the Referee found that it was a rebate, while
the trial judge, in passing on exceptions to the report,
held that it was a question of fact about which the evi-
dence was conflicting and thereupon approved the Refer-
ee's report. Treating it as a question of fact, there may
have been sufficient testimony to sustain the finding in
both instances, although the conclusion was diametrically
opposite. And, applying the rule that appellate courts
will not disturb findings of fact where the evidence is
conflicting, contradictory judgments might have been
affirmed and one plaintiff could have been awarded
damages on the theory that the Altoona allowance was
unlawful and the other been mulcted in cost because the
Altoona allowance was legal. This and like considerations
compelled the holding that, as the courts have no primary
jurisdiction to fix rates, neither can they do so at the
suit of a single plaintiff who claims to have been damaged
because an allowance paid its competitors was unreason-
able in amount.

It is argued that this conclusion ignores §§ 9 and 22,
which give the shipper the option of suing in the courts
or applying to the Commission. The same argument
was made and answered in the *Abilene Case* by showing
that to permit suits based on the charge that a particular
practice was unreasonable, without previous action by
the Commission, would repeal the many provisions of the
statute requiring uniformity and equality. For, mani-
festly, such uniformity and equality cannot be secured by
separate suits before separate tribunals involving the
reasonableness of a rate or practice. The evidence might
vary and, of course, the verdicts would vary, with the
result that one shipper would succeed before one jury
and another fail before a different jury, where the reason-

ableness of the same practice was involved. Manifestly, different verdicts would occasion inequality between the two shippers and it is equally manifest that if the Commission had made one order of which both could avail themselves, there would have been one finding, of which one, two or a score of shippers could equally avail themselves. The claim that this conclusion nullifies § 9 is concretely answered by the fact that the court has just decided to the contrary in *Pennsylvania R. R.* v. *International Coal Company.* There the carrier insisted that a suit for damages, occasioned by rebating, could not be maintained without preliminary action by the Commission. This contention was overruled, and it was held that, for doing an act prohibited by the statute, the injured party might sue the carrier without previous action by the Commission, because the courts could apply the law prohibiting a departure from the tariff to the facts of the case. But where the suit is based upon unreasonable charges or unreasonable practices there is no law fixing what is unreasonable and therefore prohibited. In such cases the whole scope of the statute shows that it was intended that the Commission and not the courts should pass upon that administrative question. When such order is made it is as though the law for that particular practice had been fixed, and the courts could then apply that order, not to one case, but to every case,— thereby giving every shipper equal rights and preserving uniformity of practice. Section 9 gives the plaintiff the option of going before the Commission or the courts for damages occasioned by a violation of the statute. But since the Commission is charged with the duty of determining whether the practice was so unreasonable as to be a violation of the law, the plaintiff must, as a condition to his right to succeed, produce an order from the Commission that the practice or the rate was thus unreasonable and therefore illegal and prohibited,

5. It is argued that under the Abilene, Robinson and Pitcairn Cases this may be true as to existing rates in which the public have an interest, but it is urged that a claim based upon the unreasonableness of past rates and discontinued practices raises a judicial question, of which the courts and not the Commission have jurisdiction.

There are several answers to this proposition. In the first place, the plaintiff cannot claim under the act and against it. To say the least, it is extremely doubtful whether, at common law, one shipper had a cause of action because the carrier paid another shipper more than the market value of transportation services rendered to the carrier. I. C. C. v. B. & O. R. R., 145 U. S. 263, 275. But if any such right existed it was abrogated or forbidden by the Commerce Act, and one was given which, as a condition of the right to recover, required a finding by the Commission that the allowance was unreasonable and operated as an unjust discrimination or as an undue preference. Texas &c. Ry. v. Cisco Oil Mill, 204 U. S. 449; Texas &c. Ry. v. Abilene Co. 204, U. S. 426, 444; Southern Ry. v. Tift, 206 U. S. 428, 437; United States v. Pacific & Arctic R. R., 228 U. S. 87. Such orders, so far as they are administrative are conclusive, whether they relate to past or present rates, and can be given general and uniform operation, since all shippers, who have been or may be affected by the rate, can take advantage of the ruling and avail themselves of the reparation order. They are quasi-judicial and only prima facie correct in so far as they determine the fact and amount of damage—as to which, since it involves the payment of money and taking of property, the carrier is by § 16 of the act given its day in court and the right to a judicial hearing (March 2, 1889, 25 Stat. 855, 859, c. 382).

In considering the administrative questions as to reasonableness, the elements of the problem are the

same, whether they involve the validity of obsolete allowances, discarded tariffs, or current rates and practices. In both classes of cases there is a call for the exercise of the rate-regulating discretion and the same necessity for having the matter settled by a single tribunal. For if at the suit of one shipper, a court could hold a past rate or allowance to have been unreasonable and award damages accordingly, it is manifest that such shipper would secure a belated but undue preference over others who had not sued and could not avail themselves of the verdict. But more than this—to permit separate suits and separate findings would not only destroy the equality which the statute intended should be permament, even after the rates had been changed, but it would bring about direct conflict in the administration of the law. Under the statute the carrier has the primary right to fix rates, and so long as they are acquiesced in by the Commission the carrier and shippers are alike bound to treat them as lawful. After the rate had been abandoned the carrier is still obliged to treat it as having been lawful, and cannot refund what had been collected under it until the Commission determines that what was apparently reasonable had in fact been unreasonable. But such a determination cannot be made by the courts, for they would not only have first to exercise an administrative function and make a rate by which to measure the reasonableness of the charge collected, but they would have to go further and treat as unreasonable a rate, past or present, which the statute had declared should be deemed lawful until it had been held to be otherwise by the Commission.

As to past and present practices for allowances, the Commission has the same power and there is the same necessity to take preliminary action. This was recognized in *Texas &c. Ry.* v. *Abilene Co.*, 204 U. S. 426, where, after considering §§ 8 and 22, relating to jurisdiction and the statutory and common law remedy, it was said that

although a railroad might alter its rates voluntarily or in obedience to an order of the Commission, yet it can "not be doubted that the power of the Commission would nevertheless extend to hearing legal complaints of and awarding reparation to individuals for wrongs unlawfully suffered from the application of the unreasonable schedule during the period when such schedule was in force." A contrary ruling would upset a useful, time-saving, economical and established practice. For in accordance with this construction of the act the Commission, after the abandonment of a rate, has repeatedly received and heard complaints and, upon finding that it had been unreasonable, has granted reparation accordingly. See *Arkansas Fuel Co.* v. *C., M. & St. P. Ry. Co.*, 16 I. C. C. 95, 98; *Allen & Co.* v. *C., M. & St. P. Ry. Co.*, 16 I. C. C. 293, 295.

The plaintiff insists, however, that all these reasons are answered by the decision in *Wight* v. *United States*, 167 U. S. 512, where the court, without preliminary action by the Commission, held that an allowance paid a consignee for hauling his freight in wagons from depot to warehouse was a rebate and thereupon inflicted the statutory punishment.

But that case did not involve any question of reasonableness of rate or allowance. Nor was the court there called on to indirectly exercise rate-regulating power, but only to pass upon the question of fact as to whether, as charged in the indictment, the defendant had paid a secret rebate to a favored consignee. It appeared that the carrier's published rate of 15 cents included the haul from Cincinnati to the yard in Pittsburg. Neither by its terms, nor by general practice, did that rate include delivery at warehouses in the city and distant from the railroad tracks. Not having undertaken to furnish free cartage, it was unlawful for the carrier to perform that service for one patron and not for all others. Paying the

favored consignee for rendering a service the carrier was not bound to furnish, was a gift—a rebate—a thing *ipso facto* illegal and prohibited by the statute and for which the guilty carrier was subject to criminal indictment, and for which damages could have been awarded on the civil side of the court. It was therefore not necessary to have a preliminary ruling by the Commission because the statute itself prohibited the payment of rebates and the courts could apply the law accordingly.

6. The plaintiff thereupon insists that even on this view of the case the judgment should be reversed, claiming that the payments here were of that prohibited character, so that even if the allowance was reasonable in amount, its payment was nevertheless unlawful because (a) given for a service not included in the rate and (b) not mentioned in the tariff.

Under the Elkins Act of February 19, 1903, 32 Stat. 847, c. 708 (*United States* v. *Chicago & A. Ry.*, 148 Fed. Rep. 646; *S. C.*, 156 Fed. Rep. 558, affirmed by a divided court, 212 U. S. 563), and under the Hepburn Act of June 29, 1906, 34 Stat. 584, c. 3591 (*Victor Co.* v. *Atchison Ry.*, 14 I. C. C. 120) it has been held that the carrier must give notice in the tariff of free cartage, lighterage, ferriage, or any other accessorial service that will be furnished, as well as of any allowance that will be made to shippers who furnish transportation facilities or service. But the present case is not to be governed by those statutes, but by the law of force between 1897 and 1901, when the transactions complained of took place. At that time the Commerce Act [1] required the carrier to give notice of

---

[1] SEC. 6. . . . The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force . . . , and shall also state separately the terminal charges and any rules or regulations which in

every charge it would make against the shipper. But the statute was not construed to compel the railroad to publish what free cartage or accessorial service it would furnish (*Detroit* v. *United States*, 167 U. S. 646), nor what sums it would pay shippers for transportation service rendered by them to the carrier. Failure to publish these items could, however, easily lead to unjust discrimination, and the court, in the case last cited, held that the Commission might, by a general order, require such matters to be published in the rate sheet. We are not cited to any such order for the period now under investigation, and, so far as we can discover, by the general and public custom of all carriers, acquiesced in by the Commission, the tariffs at that time uniformly omitted any statement of allowances that would be paid to the shipper for the use of private cars, or private tracks, or for transportation service in switching, hauling, lightering or other work, included in the rate, but actually performed by the shipper.

But although the statute then of force was not construed to require the publication of allowances, their pay-

_____

anywise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges.  .  .  .

And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force.

Every common carrier subject to the provisions of this act shall file with the Commission hereinafter provided for copies of its schedules of rates, fares, and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said Commission of all changes made in the same. Every such common carrier shall also file with said Commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any traffic affected by the provisions of this act to which it may be a party." (Act of February 4, 1887, 24 Stat. 379, 380, 381.)

ment was lawful only when supported by a consideration. To pay shippers for doing their own work would have been a mere gratuity, and if here the carrier was not bound to haul from the mine it had no more right to pay these companies for bringing their coal over the spur track to the junction than it would have had to pay a merchant for hauling his goods in a wagon to the railroad depot. The plaintiff insists that such is the case here, and that, as the tariff named the rate from the station, it could not lawfully include the haul from the mine, and consequently paying the shippers for doing their own hauling was a mere rebate.

Such undoubtedly it would have been if naming the rate from station to destination meant that the haul had to begin at the depot building. But neither the statute nor the tariff defines what are station limits, nor do they fix the exact point from which the transportation must begin, nor the territory within which the delivery must be made. These limits necessarily vary with the size of the communities, the extent of the yards, the practice of the carrier and the bounds within which it uniformly receives and delivers freight. This is particularly true in a case like the present, where the Clearfield District was treated as a single shipping point, and where the rate, though named and published as from the station, was universally applied from the mines of the Mitchell Company as well as the other companies named in the declaration and all others located in the Clearfield District.

Inasmuch as this rate included the haul the Railroad was bound to transport the coal from the mouth of the mines, and could use its own engines for that purpose or it could employ the Coal Companies to render that service, paying them proper compensation therefor. In case any question arose as to the reasonableness of the practice, the limits within which the station rates should

apply, or the reasonableness of the allowance paid those shippers who supplied motive power, the Commission alone could act. For the courts are no more authorized to determine the reasonableness of an allowance for a haul over a spur track, between mine and station, than they are to pass upon the reasonableness of a rate for a haul, over a trunk line, between station and station. What is or was a proper allowance is not a matter of law until after it has been fixed by the rate-regulating body. The courts can then apply that law, and, measuring what has been charged by what the Commission declares should have been charged, can award damages to the extent of the injuries occasioned by the payment of the allowance found to have been unreasonable and unlawful.

That station rates may be applied from mill or mine reached by spur tracks is recognized by the ruling of the Commission in the *Tap Line Cases*, 23 I. C. C. 277, where, in dealing with the practice of paying an allowance for hauling lumber from sawmills, the Commission said (p. 293):

"In all cases it is apparently the practice of the trunk lines, where no allowance is made, to set the empty car at the mill and to receive the loaded car at the same point. Indeed, they do this in many cases even when an allowance is made to the tap line. But whenever this service is performed by the trunk line, it is included in the lumber rate and is done without additional charge. In some instances the switch or spur track connecting the mill with the trunk line is as much as three miles long. In other words, by their common practice the public carriers interpret the lumber rate as applying from mills in this territory apparently as far as three miles from their own lines. So far as the manufactured lumber is concerned, it may therefore be said that where a mill has a physical connection with a trunk line and is not more than three miles distant the transportation offered by the trunk line

commences at the mill.   If, therefore, a lumber company, having a mill within that distance of a trunk line, undertakes, by arrangement with the trunk line, to use its own power to set the empty car at the mill and to deliver it when loaded to the trunk line it is doing for itself what the trunk line, under its tariffs, offers to do under the rate.   In such a case the lumber company may therefore fairly be said to furnish a facility of transportation for which it may reasonably be compensated under section 15 whether its tap line is incorporated or unincorporated. In other words, the lumber company thus does for itself what the trunk line does with its own power at other mills without additional charge and what it must therefore do for the particular lumber company without additional charge.   Under such circumstances we think the lumber company, under section 15, may have reasonable compensation when it relieves the trunk line of the duty.   But an allowance under such circumstances is lawful only when the trunk line prefers, for reasons of its own and without discrimination, to have the lumber company perform the service.   It is not lawful when the lumber company refuses to permit the trunk line to do the work." 23 I. C. C. Rep. 277.

In view of this ruling it is apparent that lateral allowances might have been lawfully paid.   They became unlawful only when unreasonable.   Whether they were so or not was a rate-making question as to which parties were directly at issue, and which the courts had no jurisdiction to determine so far as it concerned the allowances to the Altoona, Millwood and Glen White mines.   Having no jurisdiction, the parties could not by consent give it to the court, to the judge, nor to the Referee.   And if, as claimed, the stipulation to submit the case to the Referee estops the defendant from insisting on the plea of the statute of limitations, that, with all other relevant issues, can then be determined, if the Commission decides that

the allowance was unlawful, and the carrier has no other
defense.

7. But the situation of the Bolivar and Latrobe Com-
panies was very different from that at the Altoona,
Glen White and Millwood mines, and a different con-
clusion must, therefore, follow. The Latrobe and Bolivar
Companies' mines were located in the Latrobe District,
where the rates to eastern points were about 20 cents
higher than from the Clearfield District, except that for
a part of the time they were the same, though the ship-
ments were then small by comparison with those from
the Clearfield District. During that period the plaintiff
shipped in competition with the Latrobe and Bolivar
Companies. These companies owned no engines, and
they hauled no cars between mine and station. That
work was included in the rate, and the Pennsylvania did
the hauling with its own locomotives and crews. It there-
fore owed nothing to the Latrobe and Bolivar Companies
for the service which the carrier itself performed, and
the so-called allowance, regardless of the amount, was
a mere gift—a rebate, absolutely forbidden by the statute
and *ipso facto* illegal. Being an act prohibited by law,
it was not necessary to have any preliminary decision
to that effect by the Commission, but the courts could,
as in any other case, apply the law to the facts proven
and award damages to the person injured. The decision
just rendered in *International Coal Company* v. *Pennsyl-
vania Railroad* makes it unnecessary further to discuss
this branch of the case. For the court undoubtedly had
jurisdiction to proceed with this branch of the case.

The judgment, therefore, must be reversed in so far
as the action is based upon payments to the Latrobe
and Bolivar Companies, and affirmed in so far as based
upon payments to the Altoona, Glen White and Mill-
wood Companies. But owing to the peculiar facts of
this case, the unsettled state of the law at the time the

suit was begun and the failure of the defendant to make the jurisdictional point *in limine* so that the plaintiff could then have presented its claim to the Commission and obtained an order as to the reasonableness of the practice or allowance,—direction is given that the dismissal be stayed so as to give the plaintiff a reasonable opportunity within which to apply to the Commission for a ruling as to the reasonableness of the practice and the allowance involved; and, if in favor of the plaintiff, with the right to proceed with the trial of the cause in the District Court, in which the defendant shall have the right to be heard on its plea of the statute of limitations as of the time the suit was filed and any other defense which it may have.

*Affirmed and modified in part, and in part reversed.*

MR. JUSTICE PITNEY, dissenting in this case and also in *Morrisdale Coal Company* v. *Pennsylvania Railroad Company, post,* p. 304.

Since the result reached by the court in these cases has the effect of virtually eliminating the option conferred by § 9 of the Interstate Commerce Act upon shippers aggrieved by unjust discriminations practiced by common carriers in violation of §§ 2 and 3—the option to "either make complaint to the Commission" or to "bring suit for the recovery of the damages"—and of conferring upon the carrier, in some cases at least, the choice of two lines of procedure, by selecting the character of the defense to be interposed; and since in this and in other respects aggrieved shippers are to be deprived, in very large measure, of the right of redress by private action at law conferred by §§ 8 and 9 for violations of §§ 2 and 3, I deem it my duty to express, somewhat at length, the grounds of my dissent.

The case of the *Mitchell Coal and Coke Company* (No.

674) presents the question whether an action for a violation of § 2 of the Act, based upon the ground of a discrimination accomplished by means of secret rebates to competitors of the plaintiff, where the defense is that the rebates were paid (under the name of "trackage or lateral allowances"), as compensation for services rendered by the shipper in aid of the carrier, can be maintained without a prior application to the Interstate Commerce Commission and a determination by that body as to whether the alleged "trackage or lateral allowances" were reasonable and proper. This case arose in the years 1897 to 1901. The action was commenced in 1905.

The case of the *Morrisdale Coal Company* (No. 207) raises the question whether an action can be maintained for a violation of § 3 of the Act in respect of unfair discrimination in car distribution, without previous action by the Commission upon the question of the reasonableness of the treatment accorded by the carrier to the complaining shipper, or the propriety of the method of car distribution that was pursued. The cause of action accrued during the years 1902 to 1905, inclusive. Suit was commenced in 1908.

These questions are answered in the negative, upon the authority of *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Balt. & Ohio R. Co.* v. *Pitcairn Coal Co.,* 215 U. S. 481, 495; and *Robinson* v. *Balt. & Ohio R. Co.,* 222 U. S. 506. I do not at all question the authority of these cases, or the propriety of the grounds upon which they were decided. But it seems to me that the *Pitcairn Case,* as well as the case of *Interstate Commerce Commission* v. *Illinois Central R. Co.,* 215 U. S. 452, has no direct bearing upon the questions now presented; and that the authority of the *Abilene Cotton Oil Co. Case* and the case of *Robinson* v. *Balt. & Ohio R. Co.,* and the reasoning of the court therein, are directly opposed to the result reached in the present cases.

The *Abilene Case* held that a carrier who *observed* the established and published schedules of rates *without preference or discrimination* could not be held liable to an action at law to recover for alleged excessive charges when the freights charged were those prescribed by the schedule; and that although § 22 of the Act declared that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies," this saving clause must necessarily be limited so as to exclude an action based upon common-law principles, when such action would run counter to the very means prescribed by § 6 of the same Act for producing uniformity and preventing discriminations.

And in the *Robinson Case* it was held, upon like reasoning, that a differential in rate between coal loaded into cars from wagons and coal loaded from a tipple, *embodied in the filed and published schedules*, could not be deemed unjustly discriminatory in an action at law, because the Act forbade any deviation from such published schedules while they remained in effect.

In both those cases *the carriers had strictly observed the filed and published tariffs*, and were *for this reason* held exempt from action upon what would have been their common-law liability if an unqualified meaning had been attributed to the language of § 22.

The present case is the very opposite of these, and the like reasoning should, I think, lead to the opposite result. For in the *Mitchell Company Case* the carrier, *instead of observing the published schedules, itself departed from them.* And the alleged "trackage and lateral allowances" had *no sanction of filing or publishing, nor of any order made by the Interstate Commerce Commission.* And in the *Morrisdale Company Case*, the car distribution scheme pursued by the defendant *had not been sanctioned* by the Commission.

Moreover, both of the present cases relate to past trans-actions exclusively. And for this reason are not at all within the doctrine of the *Pitcairn Case,* which related. wholly to matters *in futuro.*

If the discriminations attributed to "trackage and lateral allowances" in the *Mitchell Case,* had received any previous sanction such as by § 6 of the Act is given to the filed and published schedules of rates, or if in the *Morris-. dale Case* the method of car distribution had been estab-lished or approved by an order of the Commission made in the exercise of its administrative powers conferred by the Act, I should agree that the reasoning and authority of the *Abilene* and *Robinson* and *Illinois Central Cases* would control. If either of the cases at bar had to do with the control of rates or of practices in the future, it would seem to me that the authority and reasoning of the *Pit-cairn Case* would control.

But to my mind, it seems a misapplication of the *Abilene, Robinson* and *Pitcairn Cases,* as well as a complete perver-sion of the act of Congress, to say that, respecting trans-actions in the past, which are by lapse of time put beyond the cognizance of an administrative body that normally deals only with matters *in futuro,* and respecting which the Commission has *not* acted, there shall be no right of action in the courts without previous application to such administrative body.

With great respect, it seems to me that the opinions in both the present cases err in confusing legislative and administrative functions, on the one hand, with judicial functions, on the other. Thus, in the *Mitchell Case,* after reciting the insistence of the plaintiff that the alleged "trackage and lateral allowances" were arbitrarily fixed, and constituted a mere cover for rebating, and the conten-tion of the defendant, on the other hand, that the allow-ances were made *bona fide* for services actually performed by the shipper in aid of the carrier, and that they were

*prima facie* reasonable, and must be so treated by the courts until the Commission had determined otherwise, the opinion proceeds as follows: "These claims of the parties emphasize the fact that there are two classes of. acts which may form the basis of a suit for damages.   In one the legal quality of the practice complained of may not be definitely fixed by the statute, so that an allowance, otherwise permissible, is lawful or unlawful, according as it is reasonable or unreasonable.   But to determine that question involves a consideration and comparison of many and various facts, and calls for the exercise of the discretion of the rate-regulating tribunal.   The courts have not been given jurisdiction to fix rates or practices in direct proceedings, nor can they do so collaterally during the progress of a lawsuit when the action is based on the claim that unreasonable allowances have been paid.   If the decision of such questions were committed to different courts, with different juries, the results would not only vary in degree, but might often be opposite in character—to the destruction of the uniformity in rate and practice which was the cardinal object of the statute."

This is the theory upon which both opinions proceed, the language employed in the *Mitchell Company Case* being: "The courts have no primary jurisdiction to fix rates."—"In considering the administrative question as to reasonableness, the elements of the problem are the same, whether they involve the validity of obsolete allowances, discarded tariffs, or current rates and practices."—"As to past and present practices or allowances, the Commission has the same power, and there is the same necessity to take preliminary action."

And in the opinion in the *Morrisdale Company Case* (No. 207), referring to the different views that have been expressed upon the question of car distribution, the opinion proceeds: "These rulings as to the validity of a particular practice, and the facts that would warrant a de-

parture from a proper rule actually enforced, are sufficient to show that the question as to the reasonableness of a rule of car distribution is administrative in its character, and calls for the exercise of the powers and discretion conferred by Congress upon the Commission,"—citing the *Pitcairn Case*, 215 U. S. 481, and the *Illinois Central Case*, 215 U. S. 452.

It is of course sufficiently obvious that where a legislative or administrative body is called upon to inquire with respect to the reasonableness of existing rates and practices and the propriety of sanctioning these or establishing others *for the future*, it is called upon to make somewhat the same kind of investigation of facts, conditions, and circumstances that a court and a jury, or a referee must make when adjudicating upon the lawfulness and reasonableness of practices *in the past* respecting which redress is sought by a suitor. Nevertheless, the function performed in the one case is legislative or administrative, as the case may be, and in the other case judicial.

Courts and juries, and referees, time out of mind, have been called upon to investigate the reasonableness of the past practices of common carriers. They did it long before commissions and other administrative boards were devised, and when legislation for the future rested wholly in Parliament, and Congress, and state legislatures.

It seems to me erroneous to conclude that, because the things that a court must do in order to pass judgment upon a past transaction respecting the rates or practices of a carrier are *like* the things that a commission or a committee, or other administrative or legislative body must do in order to perform their proper functions respecting present management and future regulation, therefore all investigations into the past practices or rates of a carrier are administrative or legislative.

Legislation consists in laying down laws or rules for

the future.   Administration has to do with the carrying of those laws into effect—their practical application to current affairs by way of management and oversight,, including investigation, regulation and control, in accordance with, and in execution of, the principles prescribed by the law maker.   The judicial function is confined to injunctions, etc., preventing wrongs for the future, and judgments giving redress for those of the past..

The Interstate Commerce Act, as I look upon it, clearly recognizes these distinctions.

In the Act as originally passed and under which these cases arose (February 4, 1887, 24 Stat. 379, c. 104) the duties of the company and the prohibitions of discrimination in rates and otherwise are prescribed, and *the Commission is established* for the purpose, I submit, *primarily of seeing that those duties are observed in the future.*   See the proviso of § 4, permitting the Commission to relieve the carrier from the operation of the long and short haul clause; and the requirement in § 6 that copies of the schedules of rates, fares and charges established and published in compliance with the same section shall be filed with the Commission, and notice given to it of all changes made in the same; that all traffic agreements or arrangements with other common carriers shall be likewise filed; that joint tariffs on through rates shall be filed, and these "shall be made public by such common carriers when directed by said Commission in so far as may, in the judgment of the Commission, be deemed practicable; and said Commission shall from time to time prescribe the measure of publicity which shall be given to such rates," etc.   And for a refusal by the carrier to file or publish schedules the carrier shall be subject to a writ of mandamus at the relation of the Commissioners, and the Commissioners as complainant may apply for an injunction.

But then comes § 8, declaring the common carrier to be liable to the person injured for the full amount of damages

sustained in consequence of any violation of the Act, with a counsel fee to be fixed *by the court.*

The next section has been so completely overlooked that it may be well to quote it:

"SEC. 9. That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act *may either make complaint to the Commission as hereinafter provided for,* or *may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act,* in any district or circuit court of the United States of competent jurisdiction; *but such person or persons shall not have the right to pursue both of said remedies,* and must in each case *elect which one of the two methods of procedure* hereinafter provided for he or they will adopt. In any such action brought for the recovery of damages *the court* before which the same shall be pending may compel any director, etc., to attend, appear, give testimony, etc., and may compel the production of the books and papers of such corporation," etc. No similar compulsory powers are given to the Commission.

Sec. 11 authorizes the appointment of the Interstate Commerce Commission and prescribes the qualifications.

Sec. 12 prescribes the general duties of the Commission, and remains for the most part unaltered by subsequent amendments. Unimportant amendments were made by the act of March 2, 1889, 25 Stat. 855, c. 382, and a somewhat more important one respecting the production of evidence, and the use of testimony taken under depositions elsewhere, was made by the act of February 10, 1891, 26 Stat. 743, c. 128. But an examination of § 12 is convincing of the purpose of Congress to establish the Commission as *an administrative body,* the language being that it "shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this Act, and shall keep itself informed as

to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created;" and (amendment of 1899), "*the Commission is hereby authorized and required to execute and enforce the provisions of this Act,*" etc. The remaining provisions of this section relate entirely to the machinery by which these duties are to be performed.

Sec. 13 provides for complaints or charges to be made by any person, association, municipal organization, etc., respecting anything done or omitted to be done, by a common carrier in contravention of the provisions of the Act; that a statement of the charges "shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint or to answer the same in writing within a reasonable time, to be specified by the Commission. If such common carrier, within the time specified, shall make reparation for the injury alleged to have been done, said carrier shall be relieved of liability to the complainant *only for the particular violation of law thus complained of.* If such carrier shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to *investigate the matters complained of* in such manner and by such means as it shall deem proper," etc.

By § 14, "Whenever an investigation shall be made by said Commission, it shall be its duty to make a *report in writing in respect thereto*, which shall include the *findings of fact upon which the conclusions of the Commission are based,* together with its *recommendation* as to what reparation, if any, should be made by the common carrier to any party or parties who may be found to have been injured; and such findings so made shall thereafter, in all

*judicial* proceedings, be deemed *prima facie evidence* as to each and every fact found."

By § 15 it is made the duty of the Commission to deliver a copy of its report to the common carrier, with a notice to *cease and desist from the violation of the law, or to make reparation for the injury found to have been done, or both, within a reasonable time;* and if the carrier does so, "a statement to that effect shall be entered of record by the Commission, and the said common carrier shall thereupon be *relieved from further liability or penalty for such particular violation of the law.*"

By § 16, if the carrier violates or refuses to obey a lawful order or requirement of the Commission, the latter is to *apply in a summary way by petition to the United States Circuit Court for an injunction, mandatory or otherwise.* The amendment of this section made by act of March 2, 1889, 25 Stat. 855, 860, c. 382, expressly saves the right of trial by jury in controversies requiring such a trial under the Seventh Amendment. In any such proceeding the findings of the Commission are made *prima facie* evidence of the matters therein stated.

The remaining provisions of the Act are, as it seems to me, all in accord with the general policy indicated by those above cited. The Commission is not primarily, or in any proper sense, a judicial tribunal. It can render no judgment binding upon the parties, can hold no trial by jury, cannot enforce its awards by process against the person or against property; its awards are merely *prima facie* evidence, without any conclusive effect, and must be enforced through the aid of the courts of law. It is an administrative body, a branch of the Executive Department, charged with the duty of aiding in the enforcement of the duties imposed upon the carrier by the Act; and with incidental—and only incidental—authority to award reparation, or, rather, to *recommend* reparation where it happens, in the course of its investigations,

to learn that some improper practice of the carrier has produced an injury to the shipper that calls for such redress.

The *Mitchell Case* arose in the years 1897 to 1901; the *Morrisdale Case* during the period from March, 1902, to December, 1905, both inclusive. Both actions arose, therefore, prior to the Hepburn Act of June 29, 1906, 34 Stat. 584, c. 3591, and the acts of April 13, 1908, 35 Stat. 60, c. 143, and June 18, 1910, 36 Stat. 539, c. 309.

I do not see, however, that any of the amendments makes any material change in the duties of the carriers, or the remedies for breach of them, or in the functions of the Interstate Commerce Commission, or the mode in which they are to be performed, so far as the question now under consideration is concerned. By those amendments, and by the Elkins Act of February 19, 1903, 32 Stat. 847, c. 708, the original scheme of the Interstate Commerce Act has been elaborated and the powers of the Commission extended, including a grant of the rate-making power, the power to prevent advances in rates, etc. But this only emphasizes that the Commission was established as a body having executive and legislative rather than judicial powers. For the rate-making power is a branch of the legislative.

There is another important distinction, very clearly recognized in the opinion of the court in the *Abilene Cotton Oil Co. Case,* and pretty nearly lost sight of, as it seems to me, in the present decisions; and that is, the distinction between the general rules of conduct prescribed by the Act, and the standards by which obedience to those rules is to be tested. Thus, by § 1, the rates shall not be unreasonable; and by § 2 they shall not be discriminatory. These are the general rules; but the method of enforcing them in the practical operations of the carrier is by the rate sheets prescribed by § 6 and the function committed to the Commission to revise them.

Where the rate sheet has been filed, etc., it of course becomes binding as the particular expression of the general principle. Again, in § 4, there is the general prohibition known as the "long and short haul clause"; but for a particular expression of it, as applicable to the management of a given railroad system, the Commission may act, as the proviso to that section declares. Clearly, until the Commission acts, the general prohibition is unqualified; and, when the Commission has acted, its modification is as much law as the general prohibition was before. And this reasoning, I think, applies to the respective causes of action, now under consideration. Section 2 says— "No unjust discrimination." If and when the rates are duly published, or the Commission has lawfully acted, the schedule or the order furnishes for the time the measure of determining what is an unjust discrimination. But, until the rates are filed or the Commission has acted, it is, like every other case of violation of law, a question for the courts, to be determined according to the terms of the law. And so with § 3, prohibiting undue and unreasonable preferences and advantages to particular shippers, of which, of course, discrimination in car distribution is an instance. When the Commission has lawfully taken action in accordance with its administrative duties, prescribed by the Act, its order or requirement becomes applicable; but until such order or requirement is made, the duty prescribed by § 3 remains unqualified. And if, under either section, the question of reasonableness arises in the course of an action in the courts, it must be determined according to the facts and the law, just as courts determine any and every other question of reasonableness in cases within their cognizance.

In the *Abilene Case* the court recognized that something must be taken from the force and effect of §§ 9 and 22 in order to give full effect to the context and the general scheme of the Act; and therefore it naturally (and, as

I concede, necessarily) held that the right of action conferred by § 9 "must be confined to redress of such wrongs as can, consistently with the context of the Act, be redressed by courts without previous action by the Commission, and therefore does not imply the power in a court to primarily hear complaints concerning wrongs *of the character of the one here complained of.*"

That is to say, complaints against a carrier who had *observed* the established schedule that was made by the Act the conclusive evidence (until modified by the Commission) of what rates should be deemed reasonable in law, could not be entertained by the courts (prior to action by the Commission) upon the theory that although reasonable in law the rates were excessive in fact.

This, however, in plain terms left open the doors of the courts to the suitor seeking pecuniary redress for other violations of the Act, not sanctioned by public schedules or by any other regulation declared obligatory by the Act. And within that category, as I think, are these present actions, brought against a carrier that (as we must assume in order to determine the jurisdictional question) violated the Act, instead of observing it; that so far from adhering to published regulations, or mandate of the Commission, or other order rendered obligatory by the Act, set up its own standard of practices and discriminations, and maintained them in defiance of the right of these plaintiffs to fair and equal treatment.

But the effect of the present decisions, if I apprehend them correctly, is to leave no force whatever remaining to § 9. The *Abilene Case* excluded from its wrongs of the character of the one there complained of; the present decisions excluded from its wrongs of the opposite character. That case exempted from action, the carrier who had consistently *observed* the published schedules; the present (*Mitchell*) case shields the carrier who systematically *departs from* the published schedules; and, by a parity

of reasoning, the decision in the *Morrisdale Case* exempts from primary liability at law the carrier who systematically violates the rule of equality with respect to car distribution.

In the numerous amendments that have been enacted by Congress during the 25 years that the Interstate Commerce Act has been in force, in no instance has any change been made in either of the sections (§§ 2, 3, 8 and 9) that are here important. Nor has any of the changes made in the duties of the Commission operated to deprive the aggrieved shipper of his private action at law. Indeed, in the third section of the Elkins Act of February 19, 1903, 32 Stat. 847, 848, c. 708, Congress,—while authorizing the Commission to apply to the Federal court for an enforcement of the published tariffs, or a discontinuance of discrimination, and authorizing the district attorneys, under the direction of the Attorney General, to institute and prosecute such proceedings,—was careful to declare that—"The proceedings provided for by this Act shall not preclude the bringing of suit for the recovery of damages by any party injured, or any other action provided by said Act approved February fourth, eighteen hundred and eighty-seven, entitled," etc.

But, according to the construction now for the first time adopted, in the majority of instances the right of the aggrieved shipper to resort to the ordinary courts of law for the recovery of his damages is subjected to an onerous condition precedent; or at least it may be so subjected at the option of the carrier; for, in No. 674 (the *Mitchell Coal Co. Case*), the shipper is driven to the Interstate Commerce Commission in respect of part of his claim because of the defense that the carrier interposed; while with respect to the residue of his claim, because the character of the defense was different, the action must proceed at law.

In short, without any legislative repeal of § 9, the op-

tion there conferred upon the shipper has been transferred to the carrier.

How serious is the difference becomes apparent upon a little reflection. The shipper must go first to the Commission. But when he gets before the Commission h may or may not succeed; and if he succeeds he gets no adjudication that is binding upon the carrier, for by the terms of the Act such findings are only *prima facie* correct in so far as they determine the fact and amount of damage. In order to recover them he must still resort to the courts. Thus, the shipper has a chance to *lose* his case before the Commission, but no chance to *win* it there. The ruling of the Commission may conclude the case *against* him, but cannot conclude it *in his favor.*

Now, let us suppose the normal case of a *bona fide* claim, where there is no more probability that the complaining party will succeed than that he will fail. The probability of success before the Commission is represented by the fraction $\frac{1}{2}$. If successful, he must then go to the court, and the finding of the Commission being no more than evidence, and not even shifting the burden of proof, the shipper's probability of success is again represented by the fraction $\frac{1}{2}$. Since he must receive two concurring awards, his probability of ultimate success in both tribunals is represented by $\frac{1}{2} \times \frac{1}{2} = \frac{1}{4}$. In short, instead of having the option that Congress gave him, he is confined to a single line of procedure, contrary to the tenor of the Act, and his probability of success is reduced from "equal chances" down to "one chance out of four."

It is said that the questions that arise about these practices of rebating and car distribution are complicated and difficult. Certainly that objection is not pertinent to the present cases. I see nothing beyond the grasp of a court of law in the *Mitchell Case.* The question that, as this court now holds, must await the determination of the Commission, concerns the allowances

to the Altoona, Milwood, and Glen White Mines; and it is in substance a mere question of fact as to whether anything, and if so how much, ought to be allowed for certain hauling services, and the like; if too much was allowed, the allowance was a cover for rebating; otherwise, not. And the *Morrisdale Case* reduces itself, according to the opinion, to a narrow question of law upon admitted facts. It is the old question whether, during periods of car shortage, when the carrier is unable to furnish all the cars necessary to meet the demands for transportation, shippers having cars privately owned by themselves, or railroads having cars of their own used to transport their fuel, shall, by reason of these "private cars" or "fuel cars," have a greater share in the distribution of the gross facilities for transportation than would be the case if the carrier undertook to supply cars of its own for all shippers. It is a familiar question, that has been several times before the Interstate Commerce Commission, and decided by them as a question of law upon the authority and reasoning of the decisions of the courts of law. *R. R. Com. of Ohio* v. *Hocking Valley R. R. Co.* 12 I. C. C. 398; *Traer* v. *Chicago & Alton R. R. Co.*, 13 I. C. C. 451; *Hillsdale Coal Co. & Pa. R. R. Co.*, 19 I. C. C. 356. The order of the Commission in the *Hocking Valley Case,* 12 I. C. C. 398, is the same that was sustained by this court in the *Illinois Central Case,* 215 U. S. 452.

But, conceding everything that may be claimed respecting the inherent difficulty of properly passing upon such cases, they are no more difficult than many others with which courts of law and of equity have to grapple. The Interstate Commerce Commission, so far as it passes any *quasi* judicial judgment upon such matters, does so by the pursuing methods that are modeled upon those of the courts, and which this court has recently held cannot be departed from without rendering the proceedings void. *Int. Com. Com.* v. *Louisville & Nashville R. R.*, 227 U. S. 88.

But if all the Federal judges, in all the Federal courts, and the masters and referees who are at their command, are unable as a practical matter to grapple with these questions, what shall be said of the probability that the Interstate Commerce Commission, a single body, with headquarters at Washington, with limited powers, and with enormous labors in the line of its legitimate administrative functions, will be able to properly dispose of the mass of judicial work that is now to be imposed upon it?

It is said that it is necessary to have these matters of rate discriminations and other preferential practices settled by a single tribunal. But is not this a question for Congress? And did not Congress in plain terms' confer upon the aggrieved shipper the option of going to the courts rather than to the Commission? And has Congress manifested any intent to repeal the second, third, eighth, and ninth sections of the Act?

The opinion in the *Mitchell Case* recognizes that the orders of the Commission are only "quasi-judicial and only *prima facie* correct in so far as they determine the fact and amount of damage—as to which, since it involves the payment of money and taking of property, the carrier is by § 16 of the Act, given its day in court and the right to a judicial hearing (25 Stat. 859)." But is the shipper not entitled to his day in court and to a judicial hearing? Has the Constitution any greater regard for the right of a carrier to trial by jury than it has for the right of a shipper? Conceding, as I do, that Congress could not, because of the Fifth Amendment, make the finding of an administrative body, acting without jury trial, final as against the carrier, I submit, with great respect, that it gives an unconstitutional meaning to the Act if we construe it as depriving the shipper of his remedy without trial by jury.

It is said that if actions were to be brought in the courts—"to permit separate suits and separate findings would not only destroy the equality which the statute

intended should be permanent, but would bring about direct conflict in the administration of the law." I confess myself unable to understand how giving redress by a private action for the consequences of past maladministration can conflict in any way with the proper administration of the law, which, if I understand the term, applies to the execution of it in the present and for the future. It is unfortunately true that, since courts and juries are human, the result in one case does not always seem to accord with the result in another. This is theoretically true of all suits at law; practically, the successful administration of justice in the courts belies the theory.

The court sees in the Act a purpose to have all matters affecting rates and the regulation of practices that have to do with equality of service on the part of the carrier towards the shippers "settled by a single tribunal." I have no difficulty in finding in the Act a purpose to confer the administrative power, the regulating power, upon a single tribunal, to wit, the Commission. But I find nothing, and the opinions refer to nothing, indicating a purpose that past transgressions of the Act and the cognizance of suits brought for the redress of injuries consequent upon such transgressions shall be determined by a single tribunal. It would seem more probable that Congress considered precise uniformity with respect to administering justice for past offences to be an unattainable dream. I repeat, administration, management, regulation, concern themselves with the present and the future. The awarding of relief for past offences is properly a judicial function. And, as I read the Act, Congress conferred jurisdiction over such offences upon the courts; giving at the same time an option to the shipper to resort if he would to the Commission in the first instance; doubtless on the theory that the simple cases, and those involving small amounts, would go (as experience demonstrates that they have gone) to the Commission, and that thereby that body,

while enabled to accomplish (by its recommendations and warnings) much in the way of remedying past grievances, would at the same time be put in possession of information from sources that otherwise would hardly be accessible, so that on the basis of that information it could proceed to establish regulations for the future.

Be this as it may, it seems to me highly illogical to say that damages shall not be awarded to a shipper for violations of the law committed by the common carrier in the past, because the shipper would thereby "secure a belated but undue preference." The argument overlooks the fact that, upon the hypothesis that a cause of action exists, it is the carrier who has given a preference to the plaintiff's competitor; it is for the damages resulting from that preference that the action is brought; and, if the action be justly determined, it gives to the aggrieved shipper a belated, but presumably a due, recompense.

That I have not misunderstood the real questions at issue in the *Abilene*, the *Robinson*, the *Illinois Central*, and the *Pitcairn Cases* will, I think, appear from a critical examination of those cases, in aid of which the following extracts and comments are submitted (the italics, in most instances, being my own).

*Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.* (1907), 204 U. S. 426, was a review under § 709, Rev. Stat., of a judgment of a Texas state court. The Abilene Cotton Oil Co. sued on common-law principles to recover moneys alleged to have been exacted for freight on cotton seed over and above a just and reasonable charge. There were averments (p. 430) "That the rate exacted was discriminatory, constituted an undue preference, and amounted to charging more for a shorter than for a longer haul." But (p. 432) these averments were eliminated in the course of the trial. The findings, as condensed by the court below, were (p. 432) that it was an interstate shipment, and the rates charged by the railroad company were those

established under the Interstate Commerce Act, and had been duly filed and published; but that they were in fact unreasonable and excessive. This court (by the present Chief Justice, then Mr. Justice White) said (p. 436) that the question presented was:

"The scope and effect of the Act to Regulate Commerce upon the right of a shipper to maintain an action at law against a common carrier to recover damages because of the exaction of an alleged unreasonable rate, although the rate collected and complained of was the rate stated in the schedule filed with the Interstate Commerce Commission and published according to the requirements of the Act to Regulate Commerce, and which it was the duty of the carrier under the law to enforce as against shippers."

After pointing out that the right of recovery sustained by the court below was clearly within the common-law principles stated, and was not in so many words abrogated by the Commerce Act, the court proceeded to inquire whether this common-law right had been impliedly taken away by the Act, and to what extent. The general scope of the Act was then reviewed as follows:

"Let us, without going into detail, give an outline of the general scope of that Act with the object of fixing the rights which it was intended to conserve or create, the wrongs which it proposed to redress, and the remedies which the Act established to accomplish the purposes which the lawmakers had in view.

"The Act made it the duty of carriers subject to its provisions to charge only just and reasonable rates. To that end the duty was imposed of establishing and publishing schedules of such rates. It forbade all unjust preferences and discriminations, *made it unlawful to depart from the rates in the established schedules until the same were changed as authorized by the Act,* and such departure was made an offense punishable by fine or imprisonment, or both, and the prohibitions of the Act and the punishments

which it imposed were directed not only against carriers but against shippers, or *any person* who, directly or indirectly, by any machination or device in any manner whatsoever, *accomplished the result of producing the wrongful discriminations or preferences which the Act forbade.* It was made the duty of carriers subject to the Act to file with the Interstate Commerce Commission created by that Act copies of established schedules, and power was conferred upon that body to provide as to the form of the schedules and penalties were imposed for not establishing and filing the required schedules. The *Commission was endowed with plenary administrative power to supervise* the conduct of carriers, to *investigate* their affairs, their accounts and their methods of dealing, and *generally to enforce the provisions of the Act.* To that end it was made the duty of the District Attorneys of the United States, under the direction of the Attorney General, to prosecute proceedings commenced by the Commission to enforce compliance with the Act. The Act specially provided that whenever any common carrier subject to its provisions 'shall do, cause to be done, or permit to be done any act, matter or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this Act. . . .' *Power was conferred upon the Commission to hear complaints* concerning violations of the Act, to *investigate* the same, and, if the complaints were well founded, *to direct not only the making of reparation to the injured persons, but to order the carrier to desist from such violation in the future.* In the event of the failure of a carrier to obey the order of the Commission that body, or the party in whose favor an award of reparation was made, was empowered to *compel compliance by invoking the authority of the courts of the*

*United States* in the manner pointed out in the statute, *prima facie* effect in such courts being given to the findings of fact made by the Commission. By the ninth section of the Act it was provided as follows:

"*That any person or persons claiming to be damaged* by any common carrier subject to the provisions of this Act *may either make complaint to the Commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this Act, in any District or Circuit Court of the United States of competent jurisdiction;* but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. . . .'

"And by section 22, which we shall hereafter fully consider, existing appropriate common-law and statutory remedies were saved.

"When the Act to Regulate Commerce was enacted there was contrariety of opinion whether, when a rate charged by a carrier was in and of itself reasonable, the person from whom such a charge was exacted had at common-law an action against the carrier because of damage asserted to have been suffered by a discrimination against such person or a preference given by the carrier to another. (*Parsons v. Chicago & Northwestern Ry.*, 167 U. S. 447, 455; *Interstate Commerce Commission v. Baltimore & Ohio R. R.*, 145 U. S. 263, 275.) That the Act to Regulate Commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the Act. (*Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co.*, 167 U. S. 479, 494.) And it is apparent that *the means by which these great purposes*

*were to be accomplished was the placing upon all carriers the
positive duty to establish schedules of reasonable rates which
should have a uniform application to all and which should not
be departed from so long as the established schedule remained
unaltered in the manner provided by law.* (*Cincinnati, New
Orleans & Texas Pacific Ry. Co.* v. *Interstate Commerce
Commission,* 162 U. S. 184; *Interstate Commerce Commis-
sion* v. *Cincinnati, New Orleans & Texas Pacific Ry. Co.,*
167 *Ib.* 479.)

"When the general scope of the Act is enlightened by the
considerations just stated it becomes manifest that there
is *not only a relation, but an indissoluble unity between the
provision for the establishment and maintenance of rates
until corrected in accordance with the statute and the prohibi-
tions against preferences and discrimination.* This follows,
because unless the requirement of a uniform standard of
rates be complied with it would result that violations of
the statute as to preferences and discrimination would
inevitably follow. This is clearly so, for if it be that the
standard of rates fixed in the mode provided by the statute
could be treated on the complaint of a shipper by a court
and jury as unreasonable, *without reference to prior action
by the Commission,* finding the established rate to be un-
reasonable and *ordering the carrier to desist in the future
from violating the Act,* it would come to pass that a shipper
might obtain relief upon the basis that the established
rate was unreasonable, in the opinion of a court and jury,
and thus such shipper would receive a preference or dis-
crimination not enjoyed by those against whom the
schedule of rates was continued to be enforced. This can
only be met by the suggestion that the judgment of a
court, when based upon a complaint made by a shipper
without previous action by the Commission, would give
rise to a change of the schedule rate and thus cause the
new rate resulting from the action of the court to be
applicable in future as to all. This suggestion, however,

is manifestly without merit, and only serves to illustrate the absolute destruction of the Act and the remedial provisions which it created which would arise from a recognition of the right asserted. For if, without previous action by the Commission, power might be exerted by courts and juries generally *to determine the reasonableness of an established rate*, it would follow that unless all courts reached an identical conclusion *a uniform standard of rates in the future* would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed the recognition of such a right is *wholly inconsistent with the administrative power conferred upon the Commission* and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed no reason can be perceived for the enactment of the provision endowing the administrative tribunal, which the Act created, with power, on due proof, not only to award reparation to a particular shipper, but to *command the carrier to desist from violation of the Act in the future*, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the Commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the

Commission in the premises. This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court. In other words, the established schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the Act impossible.

"Nor is there merit in the contention that section 9 of the Act compels to the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same as to a particular person or corporation was so unreasonable as to justify an award of damages. True it is that the general terms of the section when taken alone might sanction such a conclusion, but when the provision of that section is read in connection with the context of the Act and in the light of the considerations which we have enumerated, we think the broad construction contended for is not admissible. And this becomes particularly cogent when it is observed that the power of the courts to award damages to those claiming to have been injured, as provided in the section, contemplates only a decree in favor of the individual complainant, redressing the particular wrong asserted to have been done, and does not embrace the power to direct the carrier to abstain in the future from similar violations of the Act; in other words, to command a correction of the established schedules, which power, as we have shown, is conferred by the Act upon the Commission in express terms. In other words, we think that it inevitably follows from the context of the Act that *the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the Act conferred by the ninth section must be confined to redress of such wrongs as can, con-*

*sistently with the context of the Act, be redressed by courts
without previous action by the Commission, and, therefore,
does not imply the power in a court to primarily hear com-
plaints concerning wrongs of the character of the one here
complained of.* Although an established schedule of rates
may have been altered by a carrier voluntarily or as the
result of the enforcement of an order of the Commission
to desist from violating the law, rendered in accordance
with the provisions of the statute, it may not be doubted
that the power of the Commission would nevertheless
extend to hearing legal complaints of and awarding
reparation to individuals for wrongs unlawfully suffered
from the application of the unreasonable schedule during
the period when such schedule was in force."

After citing two decisions in the lower Federal courts,
and distinguishing several previous decisions of this court,
and relying upon the *Hefley Case*, 158 U. S. 98, and the
*Mugg Case*, 202 U. S. 242, as showing that the established
rates were binding, the opinion proceeds (p. 445):

"In view of the binding effect of the established rates
upon both the carrier and the shipper, as expounded in
the two decisions of this court just referred to, the con-
tention now made if adopted would necessitate the holding
that a cause of action in favor of a shipper arose from the
failure of the carrier to make an agreement, when, if the
agreement had been made, both the carrier and the shipper
would have been guilty of a criminal offense and the agree-
ment would have been so absolutely void as to be impos-
sible of enforcement. Nor is there force in the suggestion
that a like dilemma arises from the recognition of power
in the Commission to award reparation in favor of an in-
dividual because of a finding by that body that a rate in
an established schedule was unreasonable. As we have
shown, there is a wide distinction between the two cases.
*When the Commission is called upon on the complaint of an
individual to consider the reasonableness of an established*

*rate, its power is invoked not merely to authorize a departure from such rate in favor of the complainant alone, but to exert the authority conferred upon it by the Act, if the complaint is found to be just, to compel the establishment of a new schedule of rates applicable to all.*   And like reasoning would be applicable to the granting of reparation to an individual after the establishment of a new schedule because of a wrong endured during the period when the unreasonable schedule was enforced by the carrier and before its change and the establishment of a new one.   In other words, the difference between the two is that which on the one hand would arise from destroying the uniformity of rates which it was the object of the statute to secure and on the other from enforcing that equality which the statute commands.

"But it is insisted that, however cogent may be the views previously stated, they should not control, because of the following provision' contained in section 22 of the Act to Regulate Commerce viz: '. . . Nothing in this Act contained shall in any way abridge or alter the remedies now existing at common-law or by statute, but the provisions of this Act are in addition to such remedies.' This clause, however, cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the Act.   In other words the Act cannot be held to destroy itself.   The clause is concerned alone with rights recognized in or duties imposed by the Act and the manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the Act should be regarded as cumulative, when other appropriate common-law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the Act.

"The proposition that if the statute be construed as depriving courts generally, at the instance of shippers, of the power to grant redress upon the basis that an estab-

lished rate was unreasonable without previous action by
the commission great harm will result, is only an argument
of inconvenience which assails the wisdom of the legisla-
tion or its efficiency and affords no justification for so in-
terpreting the statute as to destroy it. Even, however, if
in any case we were at liberty to depart from the obvious
and necessary intent of a statute upon considerations of
expediency, we are admonished that the suggestions of
expediency here advanced are not shown on this record to
be justified. As we have seen, although the Act to Regulate
Commerce has been in force for many years, it appears
that by judicial exposition and in practical execution it
has been interpreted and applied in accordance with the
construction which we give it. That the result of such
long-continued, uniform construction has not been con-
sidered as harmful to the public interests is persuasively
demonstrated by the fact that the amendments which
have been made to the Act have not only not tended to
repudiate such construction, but, on the contrary, have
had the direct effect of strengthening and making, if pos-
sible, more imperative the provisions of the Act *requiring
the establishment of rates and the adhesion by both carriers
and shippers to the rates as established until set aside in pur-
suance to the provisions of the Act.* Thus, by section 1 of
the act approved February 19, 1903, commonly known as
the Elkins Act, which, although enacted since the ship-
ments in question, is yet illustrative, the willful failure
upon the part of any carrier to file and publish 'the tariffs
or rates and charges,' as required by the Act to Regulate
Commerce and the acts amendatory thereof, 'or strictly
to observe such tariffs until changed according to law,' was
made a misdemeanor, and it was also made a misde-
meanor to offer, grant, give, solicit, accept, or receive any
rebate from published rates of other concession or dis-
crimination. And in the closing sentence of section 1, it
was provided as follows:

"'Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the Act to Regulate Commerce or acts amendatory thereof, or participates in any rates so filed or published, *that rate as against such carrier, its officers, or agents in any prosecution begun under this Act, shall be conclusively deemed to be the legal rate, and any departure from such rate or any offer to depart therefrom shall be deemed to be an offense under this section of this Act.*'

"And, by section 3, power was conferred upon the Interstate Commerce Commission to invoke the equitable powers of a Circuit Court of the United States to enforce an observance of the published tariffs.

"Concluding, as we do, that a shipper seeking *reparation predicated upon the unreasonableness of the established rate must*, under the Act to Regulate Commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the Act to Regulate Commerce. It follows from what we have said, that the court below erred in the construction which it gave to the Act to Regulate Commerce."

In short, what the *Abilene Cotton Oil Case* decides is, that with respect to interstate commerce the Act by its own language prescribed *how it should be determined what rates should be charged* by carriers, and how such rates should be made manifest; and that while § 1 of the Act prohibited any charge beyond just and reasonable rates, it imposed the duty of establishing and *publishing schedules, to the very end of enforcing that provision*, and in the effort to prevent unjust preferences and discriminations it rendered it *unlawful to depart from the established schedules*

until they were changed by the administrative Commission; wherefore the rate thus established and published must be deemed in law a reasonable rate for all purposes affecting the rights of the carrier and shipper between themselves *until it had been altered by the commission,* which might be done if they found it unreasonable in fact. The entire reasoning of the opinion is quite consistent and logical, as well as most cogent and convincing, if confined to that subject-matter.

But to so apply that reasoning as to make it support the contention that discriminations by the carrier in *the past,* amounting to a *departure by the carrier from the established schedule,* and effectuated by the giving of secret rebates to competitors in violation of § 2, or by other discriminatory practices violative of § 3, and where the conduct of the carrier has no *prima facie* sanction under the law by reason of the filing and publishing of a schedule, or otherwise, shall not be actionable in the ordinary course of law without a previous investigation or determination by the commission upon the subject, is not only to ignore the essential differences between the facts in this case and those in the *Abilene Case,* but is to *virtually eliminate § 9 of the Interstate Commerce Act, which Congress in all its amendments has been scrupulously careful to leave untouched; and to make of the Interstate Commerce Commission, instead of an administrative and quasi-legislative body, with duties to perform respecting the laying down of rules for the future and seeing that the carriers continue to conform to their duties under the Act, a judicial body but without judicial powers, proceeding not by the ordinary process of law, but by written notices, sent here and there and everywhere to the persons concerned; not in actions inter partes, but in omnibus investigations conducted with associations of shippers and municipal corporations and other organizations, as parties of the one part, and groups of railroads, as parties of the other part; holding their sessions in Washington or wherever*

*it pleases them; without ample power to enforce the production of evidence; and without any power to enforce their findings.*

*Robinson* v. *Baltimore. & Ohio R. Co.* (1912), 222 U. S. 506, is in principle exactly like the *Abilene Case*, and was decided upon its authority. There, the schedule published and filed conformably to the Act made a differential between coal loaded into the car from wagons and coal loaded from a tipple. Robinson's shipments having come under the higher rate, he sued to recover from the company $150 which was the excess paid by him over what would have been required if his coal had been loaded from a tipple. There was an agreed statement of facts, but in it was no suggestion that the schedule had been the subject of complaint before the Interstate Commerce Commission or had been found by that Commission to be unjustly discriminatory, or that any order had been made about it. Naturally and properly this court held that there was no right of action. The pith of the reasoning is lucidly expressed in the opinion of the court (by Mr. Justice Van Devanter) as follows (pp. 508, 509):

"The Act, c. 104, 24 Stat. 379; c. 382, 25 Stat. 855; c. 61, 28 Stat. 643; c. 708, 32 Stat. 847, whilst prohibiting unreasonable charges, unjust discriminations and undue preferences by carriers subject to its provisions, also *prescribed the manner in which that prohibition should be enforced;* that is to say, the Act laid upon every such carrier the duty of *publishing and filing in a prescribed mode, schedules of the rates to be charged for the transportation of property over its road, declared that the rates named in schedules so established should be conclusively deemed to be the legal rates until changed as provided in the Act, forbade any deviation from them while they remained in effect, invested the Interstate Commerce Commission with authority to receive complaints against rates so established, and to inquire and find whether they were in any wise violative*

*of the provisions of the Act, and, if so, what, if any, injury had been done thereby to the person complaining or to others, and further authorized the Commission to direct the carrier to desist from any violation found to exist, and to make reparation for any injury found to have been done.* Provision was also made for the enforcement of the order for reparation, by an action in the Circuit Court of the United States, if the carrier failed to comply with it.

"Thus, for the purpose of preventing unreasonable charges, unjust discriminations and undue preferences, a system of establishing, maintaining and altering rate schedules and of redressing injuries resulting from their enforcement was adopted whereby publicity would be given to the rates, their application would be obligatory and uniform while they remained in effect, and the matter of their conformity to prescribed standards would be committed primarily to a single tribunal clothed with authority to investigate complaints and to order the correction of any non-conformity to those standards by an appropriate change in schedules and by due reparation to injured persons.

"When the purpose of the Act and the means selected for the accomplishment of that purpose are understood, it is altogether plain that the Act contemplated that such an investigation and order by the designated tribunal, the Interstate Commerce Commission, should be a prerequisite to the right to seek reparation in the courts because of exactions under an established schedule alleged to be violative of the prescribed standards."

The *Abilene* and *Robinson Cases* maintain the binding force of published rates and differentials established *pursuant* to the Act, until modified by the Commission in the manner provided by the Act.

The present decisions give the same force to discriminatory practices established by the carrier without leave of the Commission, *not* included in the published rates

and differentials, the practices being *in direct violation* of the Act.

*Interstate Commerce Commission* v. *Illinois Central R. Co.* (1909), 215 U. S. 452, was a suit brought by the Railroad Company in the United States Circuit Court to restrain the enforcement of an order of the Interstate Commerce Commission respecting car distribution. The issues were recited in the opinion of the court (by the present Chief Justice, then Mr. Justice White) as follows (p. 465):

"Being unwilling to comply with the order of the commission, the Illinois Central Railroad Company commenced the suit which is now before us to enjoin in all respects the enforcement of the order of the commission. It was averred that although the company was adequately equipped with coal cars and with sufficient motive power and operative forces, yet at times an inadequate supply of coal cars to meet the demand arose from the circumstances which we have previously stated. It was alleged that the regulations adopted by the company for ascertaining the capacity of the mines and for the distribution of cars were in all respects just and reasonable, and *it was charged that the order of the commission, directing the taking into account of private cars in the distribution of cars, was unjust, unreasonable, oppressive and unlawful, because it deprived the owners of such cars of the right to the use of their own property.* It was further alleged that, as to the foreign railway fuel cars, the order was also unjust, unreasonable, oppressive and unlawful, because such cars constituted no part of the equipment of the road, and, failing to count them, could not constitute an unlawful discrimination or the giving of an unjust preference within the intendment of the act to regulate commerce. *Besides charging that the order to count the company fuel cars was unjust, unreasonable, etc., it was averred that the attempt of the commission to deal with such cars was*

*beyond its power, and was but an effort to deprive the company of its lawful right to freely contract for the purchase of the fuel necessary for the operation of its road.* In addition, the proceedings in the suit brought by the Majestic Coal Company were set out, the granting of a temporary injunction therein as to counting foreign railway fuel cars and private cars was alleged, and it was charged that in any event, as to those two classes of cars, the order of the Commission was not lawful since it compelled the company to violate the injunction which was yet in force. *The Commission answered by asserting the validity in all respects of the order by it made, substantially upon the grounds which had been set out in its report and opinion announced when the order was made. All the averments in the complaint as to want of power were traversed and it was expressly charged that the subject of the distribution of coal cars as dealt with by the order was within the administrative power delegated to the commission by the terms of the Act to Regulate Commerce."*

The Circuit Court enjoined the Commission from enforcing its order "in so far as it directed the taking into account the company fuel cars in the distribution of coal cars in times of car shortage, and in so far as it directed the future taking such cars into account." The Interstate Commerce Commission appealed to this court, and the decree was reversed *on the ground that so far as it related to the company fuel cars the order of the Commission was within its administrative power.*

*Baltimore & Ohio R. R. v. Pitcairn Coal Co.* (1910), 215 U. S. 481, arose on a petition of the Coal Company for a mandamus upon the Railroad Company to restrain discrimination in the distribution of cars in the "Fairmont region" of West Virginia, alleged to be in violation of § 3 of the Interstate Commerce Act. The petition was filed January 16, 1907, in the United States Circuit Court, under § 10 of the act of March 2, 1889 (25 Stat.

855, 862, ch. 382), sometimes called § 23 of the Interstate Commerce Act, because printed under that number in the pamphlet compilation of Interstate Commerce Laws. This section provided that for a violation of any of the. provisions of the act of 1887 and amendments, preventing the relator from having interstate traffic moved at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar circumstances, to any other shipper, "a mandamus might be issued commanding such common carrier to move and transport the traffic, or to furnish cars or other facilities for transportation for the party applying for the writ." There were numerous grounds of complaint, some of which were abandoned at the hearing, and of the others the United States Circuit Court (154 Fed. Rep. 108, 120) overruled all except one, and with respect to that awarded a writ of mandamus. There were cross writs of error from the Circuit Court of Appeals, which court affirmed the judgment so far as questioned by the defendant's writ of error, and reversed it in part so far as questioned by the relator's writ of error (165 Fed. Rep. 113, 132). Upon review in this court it was pointed out in the opinion (by the present Chief Justice) at p. 492, that the question was, whether the court could grant the relief prayed consistently with the provisions of the Act to Regulate Commerce; and (p. 493): "*That a prohibition, by way of mandamus, against the act is sought* and an order, by way of mandamus, was invoked, and was allowed *which must operate, by judicial decree, upon all the numerous parties and various interests as a rule or regulation as to the matters complained of for the conduct of interstate commerce in the future.* When the situation is thus defined we see no escape from the conclusion that the grievances complained of were primarily within the *administrative competency* of the Interstate Commerce Commission, and not subject to be judicially enforced, at least

until that body, clothed by the statute with authority on the subject, had been afforded by a complaint made to it the opportunity to exert its administrative functions."

And, after referring to the decision in the *Abilene Case,* which dealt with the provisions of the Act as they existed prior to the amendment of 1906, the opinion pointed out (p. 494) that the amendment adopted in 1906 to § 15 of the Act (34 Stat. 584, 589, c. 3591), had the effect of partially repealing (what was called § 23 of the Act of 1887, but was really) § 10 of the Act of March 2, 1889, 25 Stat. 855, 862, c. 382, already referred to, which permitted the courts to award mandamus in certain cases. The opinion discusses at length the effect of the 1906 amendment of § 15 upon the remedy by mandamus conferred by the previous Act, with the result of holding that *there was an implied repeal so far as the adjustment of the car-shortage regulations in the case under consideration was concerned.*

But it will be observed that *the aid of the courts was there invoked with respect to future regulations,* and it was denied because by the terms of the act of 1906 it was placed within the administrative functions of the Interstate Commerce Commission, and the mode in which their orders were to be carried into effect was by the same amendment prescribed.

I confess myself unable to find in the *Illinois Central* and *Pitcairn Cases,* or in the reasoning of the opinions therein, any ground for holding that the *general right of action* conferred by § 8 of the original Interstate Commerce Act for a violation of §§ 2 or 3, or the *option conferred upon the party injured,* by § 9 of the same Act, has been repealed as to *past transactions where the conduct of the carrier has not the sanction of an order of the commission,* or (what is in essence the same thing) *has not the sanction of a formal compliance with the Act, which the Act itself declares shall be prima facie lawful,* as was the case with

the published tariffs that were under consideration in the *Abilene* and *Robinson Cases.*

To declare, as was declared in the *Abilene Case,* that *a carrier shall not be held actionable as for extortion in the past where it has merely charged the rates that were fixed in the schedule established in accordance with the Act,* is to my mind as far as possible from declaring that *past* practices of the carrier that are *not sanctioned by any finding or schedule,* or otherwise protected from attack by the provisions of the Act, are exempt from court inquiry; *or that the carrier is exempt from an ordinary action at law for violations of the Act, when §§ 8 and 9 in plain terms declare that the carrier shall for such violations be subject to an ordinary action at law, and declare also that the aggrieved shipper shall have the option whether he will make complaint to the Commission or bring his action in court.*

In answer to the suggestion that the result reached in these cases virtually nullifies § 9 of the Act, it is said that the contrary is shown by the decision just announced in *Pennsylvania Railroad* v. *International Coal Co.,* No. 14, *ante,* p. 184. As I have endeavored to point out in the dissenting opinion in that case, the court there concedes the right of action, but in effect denies the right of recovery; for it excludes from consideration the only measure of damages that has ever been, or can be, generally applied in actions of that character.

The result of the decisions in these three cases, taken together, is, as it seems to me, to so greatly restrict and hamper the private right of action that Congress intended to confer by §§ 8 and 9 of the Act, that it is difficult to conceive of a case where the injured shipper can, by the simple and direct mode of an action at law, recover any substantial compensation for the discriminations practiced upon him by the carrier.