**9 P.(2d) 387**

KEMP LUMBER CO. v. ATCHISON, T. & S.
F. RY. CO.*
No. 3630.

Supreme Court of New Mexico.
March 17, 1932.

* Rehearing denied April 25, 1932.

George L. Reese, of Roswell, and George L. Reese, Jr., of Lovington, for appellant.

W. C. Reid, of Albuquerque, J. M. Hervey, of Roswell, and E. C. Iden,. of Albuquerque, for appellee.

BICKLEY, C. J.

Appellant commenced an action against appellee to recover alleged overcharges on a number of shipments of coal, between October 1, 1925, and January 19, 1928. The suit grows out of the fact that the State Corporation Commission, by an order made March 13, 1928, and approved by the Supreme Court on August 16, 1928, and after rehearing, becoming effective October 18, 1928, reduced the rates on coal between the points mentioned in the complaint. Artesia Alfalfa Growers' Ass'n v. Atchison, T. & S. F. R. Co., 33 N. M. 468, 270 P. 796. The purpose of the action, in substance, is to recover the difference between the rates finally and affirmatively fixed by the commission and the rate theretofore charged back to the time when complaint against the existing rates was made to the State Corporation Commission, by the appellant and other shippers on October 29, 1927. Such complaint prayed that the carrier be required: "To cease and desist from the violation of the laws of the State of New Mexico in charging said unreasonable, unjust and discriminatory rates, and that the defendants be required to immediately publish and establish, and in the future to maintain such just, reasonable and non-discriminatory rates as to this commission may seem equitable and proper and that the defendants be required to pay to com-

plainants as a damage, any amounts unlawfully and unjustly collected from them on shipments of coal heretofore made or that shall be made during the pendency of this action."

After due hearing and investigation, an order was made by the commission stating the opinion and finding: "That the present rates on lump coal from origin points named to the destination points involved in this case have been, are and for the future will be unreasonable to the extent that they exceeded, exceed or may exceed the rates set out below."

It was further ordered that: "Rates which shall not exceed the rates herein found reasonable" should be established by the defendants on or before 40 days after the date of the order.

The order also contained the following recital: "Complainants' prayer for reparation has not been given any consideration and no order with relation thereto will be made."

The complaint in the action at bar alleges ·that the rates complained of were "unreasonable, discriminatory, unlawful, unjust and extortionate." Appellees demurred to the complaint on the ground, among others, that it does not state facts sufficient to constitute a cause of action, in that it does not appear in the complaint that the rates charged by the defendant railway company, and complained of, were not the rates ·authorized as set forth in the tariff schedule duly filed and published and approved by the State Corporation Commission, and that it was not alleged in the complaint that the rates charged were dis-

criminatory against any like shipments, or that the rates were unauthorized.

The district court sustained the demurrer, and, the appellant electing to stand upon its complaint, the court dismissed it. Hence this appeal.

Appellant's position is that a common carrier owes a duty to transport the goods of the shipper at reasonable rates, and that, if unreasonable rates are exacted, an action may be maintained at common law to recover the excess over a reasonable charge.

Appellant cites in support of its contention, Santa Fé G. & C. M. Co. v. A., T. & S. F. Ry. Co., 21 N. M. 496, 155 P. 1093, 1094, wherein section 7 of article 11 of our Constitution is interpreted as not to authorize the State Corporation Commission to award reparation for past excess and unreasonable charges for transporting freight. The language of the opinion relied upon by appellant is as follows: "In the first place the recovery of money unreasonably exacted in cases like this is by means of a common-law remedy, and the party against whom the claim is made, whether a natural person or a corporation, has the right, ordinarily, to a trial by jury before its repayment can be enforced."

Appellee does not dispute, and we do not doubt, that at the common law the shipper was entitled to have his goods transported at reasonable rates and to go to court to recover extortionate charges. It is not necessary to say that such remedy does not now exist. There arises no occasion to doubt that a shipper may recover charges exacted in excess of the legally established rates. Our decision must turn on "what are legally established rates."

Appellee says that the common law has been to an extent, at least, superseded. Both parties agree that the principle of the right of organized society to regulate the rates and practices of public carriers has been long recognized. It is well established that: "The rate-making power is a legislative power and necessarily implies a range of legislative discretion; and the question to be determined by a tribunal to which this power has been delegated is 'is the rate just and reasonable?'" Watkins, Shippers and Carriers, 4th Edition, page 91, citing the Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, and other decisions of the Supreme Court of the United States.

As early as 1912, Attorney General Clancy, in an opinion furnished to the State Corporation Commission, said: "The only real restriction, therefore, upon your powers as to the fixing of railroad rates is that they shall be reasonable." In the same opinion, the Attorney General cites the opinion of the court in Lake Shore & M. S. R. Co. v. Smith, 173 U. S. 684, 19 S. Ct. 565, 569, 43 L. Ed. 858, wherein it is said: "Prima facie, the maximum rates as fixed by the legislature are reasonable."

In Atchison, T. & S. F. Ry. Co. v. Arizona Grocery Co., 49 F.(2d) 563, the Circuit Court of Appeals of the Ninth Circuit, considering orders of the Interstate Commerce Commission, decided: "Order fixing maximum rate

amounted to decision that rates below maximum were just and reasonable." We have decided a number of times that rate-making is a legislative power vested in the Legislature and in the State Corporation Commission, and a power which the courts may not assume. Our latest expression on this subject being in Seaberg v. Raton Public Service Co., 36 N. M. 59, 8 P.(2d) 100. Appellant conceded this with respect to new rates, but not as to past rates. It says that, in the determination of the reasonableness of a past rate, a regulatory commission having the power to make such determination acts in a judicial capacity, and from this he argues that the courts may make such a determination.

The Circuit Court of Appeals of the Ninth Circuit in Atchison, T. & S. F. Ry. Co. v. Arizona Grocery Co., supra, said: "The fixing of a past rate by the Commission for purposes of awarding reparations certainly has some of the attributes of a legislative act, notably that it is of universal application to all past transactions, whether the shippers are parties to the proceedings or not. It is binding upon both the carrier and its shippers, and this because any other rule would destroy uniformity, which the act endeavors to establish and maintain."

When a fixing of the rate by the Interstate Commerce Commission as a basis for reparations occurs, there remains in an application for damages for charging unreasonable rates other factors which enter into an award, such as the amount of the freight, the point of origin and of delivery, the owner of the shipment, etc., which may be sufficient to characterize the award as resulting from the exercise of what the courts sometimes call a quasi judicial power.

The appellant says in his brief: "The Court will take judicial notice that the matter of fixing and determining freight rates involves many complications which ordinarily require the services of trained experts to determine. The ordinary Court is not sufficiently familiar with the elements entering into the fixing of rates to be able to intelligently pass upon the question as to whether or not a rate is reasonable or unreasonable." With this observation we agree, and we also agree with the Supreme Court of the United States in Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U. S. 247, 33 S. Ct. 916, 921, 57 L. Ed. 1472, that: "In considering the administrative questions as to reasonableness, the elements of the problem are the same, whether they involve the validity of obsolete allowances, discarded tariffs, or current rates and practices." See, also, Eagle Cotton Oil Co. v. Southern Ry. Co. (D. C.) 46 F.(2d) 1006.

The courts sometimes use the expression "regulation" as synonymous with "legislation." Appellee asserts that the Legislature of New Mexico began to exercise this power of regulation at its session in 1878, which enactment has been carried forward into the Compiled Statutes of 1929 as section 116-202, paragraph 11, and has never been expressly repealed and which provides that a railroad

company has power to "regulate the time and manner in which passengers and property shall be transported over its roads, and the tolls or compensation to be paid therefor," subject to the restriction that "it shall be unlawful for such corporation to charge more than six cents per mile for each passenger, and fifteen cents per mile for each ton of two thousand pounds, or forty cubic feet, of freight transported on its roads."

Appellant concedes that, where the Legislature or a constitutionally or legislatively authorized body has regularly established a rate as reasonable and just, such rate is the only rate which may be charged by the common carrier, and hence a court action attacking the reasonableness of such rate could not be maintained in the first instance. It argues, however, that, where the rates are "carrier made" instead of "Legislature made" or "commission made," the action at common law to recover charges which are in excess of reasonable rates may be maintained. We may not doubt this proposition. We find many expressions in the books to sustain this view. The phrase most generally used to characterize such a rate situation is *purely* carrier-made rates." Appellant says that: "Under the regulatory system in New Mexico, until the State Corporation Commission has affirmatively put the stamp of its approval on a rate, the rate charges, even though those set forth in the tariff schedule required by law to be filed with the Corporation Commission and published, are purely 'carrier-made' rates." It likens our regulatory system to that existing under the federal statutes known as the Act to Regulate Interstate Commerce, where, as it claims, rates specified in tariff schedules filed with the Interstate Commerce Commission go into effect of their own motion without affirmative order of approval by the commission, and says it is unlike the systems prevailing in Alabama, Mississippi, and Virginia, where it asserts the rates are not promulgated and established until affirmatively approved by the rate-regulating bodies of those states so that, when promulgated, the rates have the sanction of law and are "commission made" rates.

It is an interesting fact that both parties rely upon the same precedents in a number of instances. Appellant concedes that, if under our system the rates are "commission made," it has no standing in court in the case at bar.

The determination of the question whether rates are adjudicated rates under New Mexico laws therefore settles this controversy. It will be well, therefore, to consider the basis of the decisions and the argument in the Alabama, Mississippi, and Virginia cases cited.

In T. R. Miller Mill Co. v. Louisville & N. R. Co., 207 Ala. 253, 92 So. 797, it was decided: "There can be but one 'lawful rate' in force at a given time, and that rate, by the terms of Code 1907, §§ 5525, 5527, 5553, 5554, 5651, is the rate which has been filed and approved by the Railroad Commission and published by the carrier and behind that rate, so long as it remains unchanged, and so far as its application to specific shipments is

concerned, neither shipper nor carrier can go, and courts cannot inquire." The consequences of a deviation from such lawful rates, even by a retroactive order of the commission, are thus referred to by the court: "Such schedules cannot be made unlawful for and during the period of their approved operation by any subsequent retroactive finding and order of the Commission. Such a practice would be odious to the generally established notions of justice, and would, moreover, be utterly subversive of the policy and utility of any system of rate regulation; for no rate could be relied upon as stable, and neither carrier nor shipper could ever be certain of the basis upon which business was being conducted. *For it must be observed that, under such a practice, the Commission would just as well find that a rate approved and imposed by it years before was in fact unreasonably low, and give retroactive operation to the higher rate later found to have been reasonable.* Of course no such practice was contemplated, and no such power was vested in the Commission." (Italics supplied.)

In E. L. Young Heading Co. v. Payne, 127 Miss. 48, 89 So. 782, 786, the court held that the Mississippi statutes intended that all freight schedules shall be filed with and approved by the railroad commission, that no carriers shall charge more nor less than the rate fixed, and shipper cannot recover for unreasonable charge of rate so approved, and that the shipper's remedy for unreasonable charges under an approved schedule is by an application to the railroad commission. The court said that the outstanding purpose in the enactment of such statutes was that there might be fixed and stable freight rates, as well as reasonable and just rates; and that all shippers should pay exactly the same rate for like service; and to that end that all tariffs should be published by the carrier and filed with and approved by the Corporation Commission; and that no carrier should charge neither more nor less than such rates so fixed. The court went on to say that the shipper is furnished by statute with a remedy for an extortionate rate authorized by such tariffs by means of complaint to the railroad commission, and, after a hearing, that body is fully authorized to reduce any rate, and enforce compliance therewith by the carrier. The court then observes: "If the contentions on behalf of the appellant were sound, the whole scheme and plan of the supervision statutes would be upset, because varying judgments might be rendered by different courts in suits brought by different shippers, even though each case was based upon identically the same state of facts. Thus instead of having uniform and fixed rates the result could and might be a different rate for every shipper who chose to go into court in a suit against the carrier to test an alleged overcharge."

In Mathieson Alkali Works v. Norfolk & W. Ry. Co., 147 Va. 426, 137 S. E. 608, 612, the court held that the Corporation Commission cannot declare legally established rates unreasonable retroactively, and shippers cannot recover for excess charges on previous shipments. It is true that the court adverted to the fact that, under the Virginia stat-

utes, intrastate freight rates are made by the State Corporation Commission as distinct from carrier made interstate rates under the Interstate Commerce Act (49 USCA § 1 et seq.), and that rates approved by the Virginia commission are conclusively presumed legal and reasonable until changed by the commission as to the future, but the commission cannot declare rates legally established unreasonable retroactively, and commission's finding that rates between certain points were unreasonable, did not entitle shippers to recover as for excess freight rates on shipments previously made. The court pointed to a Virginia statute providing that, when the State Corporation Commission had authorized or prescribed and published rates, it should be unlawful for any carrier to charge or receive a greater or less compensation for the transportation of passengers or property. It is not clear that in Virgina the rates are commission made rates in their inception. The court pointed to a constitutional provision similar in some respects to section 7 of article 11 of our Constitution, which the court said imposes upon the Corporation Commission the primary duty of prescribing and enforcing such rates, etc., as may seem reasonable and just. The court also remarked: "It is true, as contended by plaintiff, that there is nothing in the statute passed by the Legislature which imposes upon the commission the duty to affirmatively determine the reasonableness of all rates proposed or petitioned for by transportation companies, but the Constitution and statutes contemplate that all rates shall be presented to and changes in rates shall be approved by the commission, and all these upon notice, publication, etc., a procedure which gives finality of character to the action of the commission upon rates, in sharp contrast to *purely* carrier-initiated rates under the federal practice." The court said that the real question involved in the case was: "Has the Corporation Commission of Virginia the power to retrospectively condemn rates established according to law as unreasonable? * * * No such express power is found in the Constitution or statute law of Virginia as is found in the Interstate Commerce Act, but it is contended that the power is necessarily implied." Such is the contention of the appellant in the case at bar with respect to implied powers of our Corporation Commission. Such a power was attempted in Santa Fé F. G. & C. M. Co. v. A., T. & S. Fé Ry. Co., supra, but the court held that the commission had no such power.

Similar reasons are given in the adjudicated cases construing the Interstate Commerce Act to sustain the theory that there can be but one "legal rate" in force at a given time. In view of the expressions to which attention is now directed, we do not consider as persuasive the suggestion made in some of the cases above cited, that rates under the Interstate Commerce Act are purely "carrier made" rates. They may be carrier initiated rates, but, if permitted to stand unchanged, they become, in effect, commission made rates.

In Pecos Valley & N. E. R. Co. v. Harris, 14 N. M. 410, 94 P. 951, the Territorial Supreme Court decided: "It is beyond the power of either a railroad company or a shipper to

make a valid contract for a less rate than the public schedule filed with the Interstate Commerce Commission, and notwithstanding such a contract the liability of the shipper is the rate so published and filed."

Section 710 of the article on Carriers in 10 C. J. declares: "The right to maintain an action at common law to recover the excess of freight charged on an interstate shipment, over the rate fixed by the interstate commerce commission, is not affected by any of the provisions of the Interstate Commerce Act. But the Interstate Commerce Act abrogates the common-law remedy for the recovery of alleged unreasonable freight charges on interstate shipments, where the rates charged are those duly fixed by the carrier according to the act, and which have not been found unreasonable by the interstate commerce commission;"

The "reason for the rule" is drawn by the text-writer from Texas, etc., R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 355, 51 L. Ed. 553, 9 Ann. Cas. 1075: "If, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission, and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal which the act created with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the Commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the Commission in the premises. This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court. In other words, the established

schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."

To the Ann. Cas. report of the case last referred to is an annotation referring to Van Patten v. Chicago, etc., R. Co. (C. C.) 81 F. 545, 554. In that case a shipper's petition alleging that a certain rate charged for the shipment of grain was unreasonable was met by an answer that the charge was in accordance with the scheduled rate. To this answer the shipper interposed a demurrer based upon the proposition that, if the rate charged was unreasonable, then it was no defense to show that the rate charged and paid was the scheduled rate. The court, in overruling the demurrer, said: "It is apparent that if the schedule of rates provided for by the act [interstate commerce act] and adopted and posted in accordance with its provisions is not to be accepted as the basis for determining whether charges made are reasonable, then the carriers and shippers alike are left without any certain or reliable guide for determining the rate that should be demanded and paid for given shipments. Under such a system, uniformity and equality in rates cannot be secured, and the main object of the act, to wit, the prevention of discrimination by way of secret rebates and the like, which it is sought to secure by the provisions requiring the adoption and making public of a fixed schedule of rates and the requirement that the carrier shall not deviate therefrom, will be defeated, because,

on the theory of the plaintiff, the shipper is not bound to pay that rate unless a jury decides that it is reasonable, and, if the shipper is not bound to pay it, the carrier is not entitled to demand, receive, and retain it. If the contention of plaintiff be sound, every schedule of rates posted by carriers under the provisions of the act should have attached thereto the memorandum: 'Subject to change in accordance with the verdicts of juries which may hereafter be rendered.' If the theory advanced by the plaintiff in support of the demurrer is sustained, to wit, that in suits of this nature, based upon the interstate commerce act, and wherein it is sought to determine the reasonable rate chargeable for a given number of shipments of freight, the schedule of rates established by the carrier, and posted as required by the act, is to be laid aside, and the jury must undertake to decide as best they may what the reasonable rate in fact was, the result must be that inequalities in rates exacted will be created, and discriminations in effect will be created and enforced; thus violating the more important and valuable provisions of the act. The statute does not confer upon courts and juries the power or the duty to prescribe in advance what rates may be charged. That duty the act does place upon the carrier; and when the carrier, in obedience to the statute, has established and posted a schedule of rates, it becomes binding on the carrier, who cannot deviate from it without being guilty of a misdemeanor, and becoming subject to the penalties provided by section 10 of the act; and yet the theory of the

plaintiff is that when the defendant company made its charges for the shipments described in the several counts of the petition it ought to have deviated from the previously posted schedule rates, and because it did not do so it is now liable in damages to the plaintiff. It is the consideration of these and like difficulties which would be created if the contention of plaintiff be sustained, and which would result in the practical defeat of the main purpose of the interstate commerce act, to wit, the securing uniform and equal rates for like services, and the prevention of unjust discriminations, which leads me to the conclusion that it is the intent of the interstate commerce act to make the schedule of rates required to be adopted, printed, and posted by the carrier the basis for determining whether a given rate exacted from a shipper is or is not unreasonable under the provisions of the act, and I therefore hold that the demurrer to the answer is not well taken, and must be overruled."

Since the appellant claims there is a difference between the federal system and that prevailing in Alabama, Mississippi, and Virginia, we must observe that upon reason and precedent the distinction is too shadowy to be relied upon.

In Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U. S. 247, 33 S. Ct. 916, 921, 57 L. Ed. 1472, the court said: "Under the statute the carrier has the primary right to fix rates, and so long as they *are acquiesced in* by the Commission, the carrier and shippers are alike bound to treat them as lawful. After the rate had been abandoned, the carrier is still obliged to treat it as having been lawful, and cannot refund what had been collected under it until the Commission determines that what was apparently reasonable had in fact been unreasonable. But such a determination cannot be made by the courts, for they would not only have first to exercise an administrative function and make a rate by which to measure the reasonableness of the charge collected, but they would have to go further and treat as unreasonable a rate, past or present, which the statute had declared should be deemed lawful until it had been held to be otherwise by the Commission."

The following from Drinker, "Interstate Commerce Act," affords additional expression of the same idea:

"Sec. 240. Effect of Filing Rates. In Poor Grain Co. v. Chicago, B. & Q. R. Co., (12 I. C. C. Rep. 418, et seq.) Commissioner Harlow said: 'When once lawfully published, a rate, *so long as it remains uncancelled,* is as fixed and unalterable either by the shipper or by the carrier as if that particular rate had been established by a special Act of Congress. When regularly published it is no longer the rate imposed by the carrier, but the rate imposed by the law.'

"Where the carrier charges the rates and accords the service specified in its regularly published tariffs, the courts have no jurisdiction to award damages to a shipper on the ground that such rates or regulations are unreasonable"—citing Baltimore & O. R.

Co. v. U. S. ex rel. Pitcairn Coal Co., 215 U. S. 481, 30 S. Ct. 164, 54 L. Ed. 292.

By section 7 of article 11 of our Constitution, it is provided: "The commission shall have power and be charged with the duty of fixing, determining, supervising, regulating and controlling all charges and rates of railway, express, telegraph, telephone, sleeping-car, and other transportation and transmission companies and common carriers within the state."

The commission is given power to change or alter such rates either on complaint or upon its own initiation; to subpœna witnesses and enforce their attendance before the commission; it has the power to inspect the books, papers, and records of common carriers doing business in this state and to require from such common carriers from time to time special reports and statements under oath, concerning their business. The Constitution declares that the Legislature shall provide suitable quarters for the commission and funds for its lawful expenses, including necessary traveling expenses, witness fees, and mileage and costs of executing process issued by the commission or the Supreme Court or the district courts. The Legislature, in the first session after the Constitution became effective, enacted a statute "Relating To Procedure Before The State Corporation Commission And The Powers And Duties Of Said Commission." That act is carried forward into the Compilation of 1929 in chapter 134, commencing at section 1106. By this and other legislative enactments, the powers of the commission were extended and amplified. It was authorized to employ a chief clerk, an assistant chief clerk, a rate clerk, stenographers, and other assistants.

In order that the commission might not be delayed in the selection of a rate clerk and commence its consideration of rates quickly, it was provided that the two years' residence qualification for holding public office in this state should not apply to such rate clerk employed by the commission.

The reasoning of Judge John F. Philips in Winsor Coal Co. v. Chicago & A. R. Co. (C. C.) 52 F. 716, 720, is applicable to the case at bar because of the similarity in the system he had under consideration, and ours. Under the statutes of Missouri the Legislature had undertaken the task of regulating freight rates of railroads. It had prescribed a maximum charge for the class of property in question, and made various provisions against extortionate charges, unjust discriminations, and combinations. It had created the office of railroad commissioners and invested them with various powers of supervision over the railroads of the state, and otherwise the powers of such commission were similar to that of our Corporation Commission. In an action to recover triple damages for charging an alleged unreasonable rate or freight, the court held that the right of action existing at common law in favor of the shipper for extortionate charges was superseded by the remedies provided by the statute. The court said:

"Throughout the entire act it is clear that it was the legislative mind to impose upon *the chosen agents of the* state—the railroad commissioners—the duty of supervising and regulating the rates charged by such carriers, and to ascertain and declare, from time to time, as the changing conditions of trade and commerce might suggest, what, as between shipper and carrier, is a reasonable and just rate of compensation. *In the absence of any affirmative action by the commissioners, the legislature declares a maximum rate, and the carrier is to make and keep public a schedule within this maximum.* The railroad commissioners may revise it, if deemed right and just to do so; and the rates thus fixed are to be observed by the carrier until changed conformably to the statute. The statute expressly declares it to be unlawful for the carrier to exact a greater or less rate than that so scheduled. *In the absence of any affirmative action by the commissioners, the intendment of law arising from the legal presumption that public officers perform their duties should be that no complaint had arisen of unjust charges, or that the commissioners, who are presumed to be in possession of the schedule adopted by the carrier, deemed the maximum fixed by the carrier and the legislature to be reasonable and just.*

"Does it stand to reason that, after the legislature had provided all these agencies and instrumentalities for regulating the freight rates, and ascertaining and determining, pro bono publico, what is just and reasonable, and making that ascertainment prima facie evidence of its correctness in judicial controversies between shipper and carrier, it was contemplated that any shipper could thereafter be at liberty to disregard this lawfully established rate, and have its reasonableness and justness submitted to the arbitrament of a jury of the country? Can it be possible that, after the legislature has thus provided in detail a scheme for the establishment of reasonable rates, which shall be uniform to all the people, it intended by the general terms of sections 1, 10, and 11 to authorize any malcontent to go to a jury to fix for him another rate? What in the judgment of one jury in one locality would be an unreasonable charge might in the opinion of another jury in another locality be quite reasonable. With the known capriciousness of jury verdicts, influenced often by individual peculiarities, mental habits, the quantum and quality of the evidence in the particular case, how would it be possible to carry out the legislative intent to establish and maintain a uniform rate of charges? Would not the diversity of conclusions reached by different juries between different litigants in and of itself bring about discriminations and inequality? Under such a construction of this statute as contended for by plaintiff it is not apparent how any railroad company could safely do business in the state. Its agents could never know when they were safe in any charge by them made. After a schedule of rates has been approved and published, the statute makes it unlawful for the carrier to charge less than the scheduled rate, under the pains and penalties prescribed in the act; and yet, under plaintiff's theory, the common carrier

might be liable for the penalty of triple damages because it did not charge a lesser rate.

"Notwithstanding the phraseology of this statute may be, in some respects, inapt or ambiguous, yet it is the duty of the court to so construe the whole statute as to avoid, if possible, conflicts between different parts, and, by keeping in view the intention and design of the lawmaking power, to escape absurdities, and reconcile contradictions more apparent than real. *It is the common carrier against which this legislation is directed. It is its acts, its delinquencies, which are sought to be guarded against and corrected. As against it, in any judicial controversy between it and the shipper*, or between it and the state, respecting its freight charges, *the schedule of rates limited by the state or declared by the commissioners shall*, in favor of the shipper or the public, be taken as prima facie just and accurate; and the railroad company must assume the laboring oar to overcome this presumption. The statute simply reserves the right to the carrier to go to the courts under this disadvantage to have the findings of the commissioners reviewed. To the shipper the act gives every reasonable privilege and advantage. He can go to the board of commissioners with his complaint, and, without cost to himself, have an investigation by them of his grievances, with the means of enforcing the conclusions of the commissioners; or he may go, as has this plaintiff, directly to the courts, and have a trial 'in due and ancient form,' and show, if he can, that the rate charged him is in excess of the limit fixed by the statute and the commissioners. When he does this, he stands in court with a prima facie case of unreasonable exaction made by the carrier.

"Statutes of this character are not peculiar to this state. Similar legislation is to be found in other states, such as Nebraska, Iowa, Illinois, Georgia, and perhaps others. While these statutes may differ somewhat in phraseology and detail, the general trend, scheme, and policy are the same. The courts of those states, in construing their statutes in the particular under discussion, hold that the carrier *may charge the maximum rate fixed by the statute*, and a liability to the penal action never arises until the carrier passes in his charges this dead line. This for the reason, which stands upon a granite foundation of public justice and common sense, that no act of the citizen can be unlawful which the law permits. A statute which would attempt to declare a different rule would not only be a legal solecism, but would commit an act of felo de se. * * *

"A right of action in favor of the shipper, it may be conceded, existed at common law for extortionate charges, but the statute has superseded the common-law remedy. * * * The plaintiff having no ground of action for an unreasonable and unjust charge against the carrier, except where the carrier has transcended the limit prescribed by the state's agents, the petition should allege the facts necessary to bring the case within the operation of the statute. * * * This is not done, and the demurrer is sustained."

We are confident that with the constitutional conference of plenary rate-making power upon the Corporation Commission, rates which had been theretofore made by the Legislature must yield to that superior power when exercised, but appellee enjoys the benefit of the argument of much force that, if the rates specified, in the filed and published tariff schedule, have not become by acquiescence "commission made" rates, they are "Legislature made," unless it is shown that they are in excess of the maximum fixed by the statute heretofore cited.

Suppose a carrier has filed and published rates as required by law, and the rates are below the maximum authorized by the Legislature, and after a reasonable length of time no affirmative action is taken by the commission to approve or alter the rates, would a court enjoin the enforcement of such tariff rates, on the ground that they are unreasonable? We think not.

We would not be disposed to hold appellant to the admission in his brief that, if the rates in New Mexico are commission made (Legislature made) rates, the action in the case at bar could not be sustained if we were not, after careful consideration, convinced that his concession is fully warranted. And having arrived at the conclusion that they are Legislature made rates, it becomes unnecessary to consider a number of other interesting questions presented in the brief of able counsel for appellant.

We think it may serve a good purpose to call attention to the distinction between the power to find a past rate unreasonable and make an award of damages thereon, and the power to fix a new rate to be applicable and binding in the future. Both of these powers are vested in the Interstate Commerce Commission, the first by the statute of 1887 (24 Stat. 379) and the latter by the act of 1906 (34 Stat. 589, § 4, 49 USCA § 15). In Fuller Interstate Commerce, it is said at page 414 et seq.: "The two subjects of reparation and rates may be dealt with in one order but awarding reparation for the past and fixing rates for the future involve the determination of essentially different matters. The former involves the quasi-judicial capacity of the Commission in measuring past injuries received by an individual; the latter the quasi-legislative capacity of that body in preventing future injury to the public. As suggested, the one is of a private and the other of a public nature. The unreasonableness of a past rate and the determination of the future rate can be, and they often are, disposed of by the Commission by the same order. But this is not necessarily so. Under the original form of the Act to Regulate Commerce, the two questions could not be combined in a single order for the reason that at that time while the Interstate Commerce Commission could require the carrier to desist from unreasonable practices and award damages, it could not fix rates. The result of this situation was most anomalous. For after a shipper had obtained an order of reparation because of an unreasonable rate which the railroad was ordered to discontinue, a slightly different, but none the less unreasonable, rate

might be charged by the carrier for the future, which the shipper was forced to pay and again institute proceedings for reparation. The Hepburn Act relieved this situation by conferring upon the Interstate Commerce Commission the new power to determine rates for the future in addition to its already existing power to make reparation. However, the two matters are dealt with in separate sections of the Act and treated as different subjects. Thus, section 4 of the Hepburn Act (section 15 of the amended Act to Regulate Commerce) conferred upon the Commission power to make rates, while section 5 of that Act (section 16 of the Act to Regulate Commerce) gave the Commission power to make reparation orders. Not merely were the two subjects separately treated in the legislation, but there is no such necessary connection between them, or interrelation, as to make the quasi-judicial order for reparation depend for its validity upon being joined with a quasi-legislative order fixing rates for the future. Persons entitled to the one may have no interest in the other. Those interested in both might be entitled to reparation and not to a new rate; or visa versa, they might be entitled to a new rate and not to reparation. For instance, under section 13 of the Act any mercantile or agricultural society, or municipal organization may make complaints to the Commission against a carrier. Upon the application of such bodies, the old rates might be declared unjust and new rates established. But, manifestly, no reparation would be ordered for the reason that such complaints

were not shippers and thus not entitled to an award of pecuniary damages. *Further a rate, reasonable when made, might become unreasonable as the result of a change in conditions, so that no reparation would be ordered even though a new rate were established for the future.*"

The considerations mentioned in the last quotation show that the Congress has adopted two main factors in regulating public carriers, whereas our Constitution makers adopted only one of these.

It is not within the power of the courts to supply the deficiency, if deficiency there be.

The difficulties herein pointed out constrain us to hold that the proceeding in the present case is in the nature of a collateral attack on rates authorized by the Legislature and acquiesced in by the commission.

It is a well-known canon of statutory construction that, where a common-law right cannot, consistently with the general purpose of the statute, be enforced, the injured party must obtain remedies under and in accordance with the statute.

The shipper's remedy would be a seasonable application for a change of rate before any serious damage had been suffered.

Finding no error in the action of the district court, the judgment will be affirmed, and the cause remanded, and it is so ordered.

WATSON, PARKER, SADLER, and HUDSPETH, JJ., concur.